423 So.2d 674 (1982)
Cora NAYLOR, Curatrix of the Interdict, Roger A. Naylor
v.
LOUISIANA DEPARTMENT OF PUBLIC HIGHWAYS and Louisiana Department of Public Safety.
No. 15053.
Court of Appeal of Louisiana, First Circuit.
October 12, 1982.
Rehearing Denied December 16, 1982.
Writs Denied February 11, 1983.
*676 William D. Hunter and Charles B. Plattsmier, Morgan City, for plaintiff and appellee.
Risley C. Triche, Napoleonville, for Louisiana Dept. of Public Safety.
*677 David K. Balfour, Baton Rouge, for Louisiana Dept. of Transp. and Development.
John L. Lanier, Thibodaux, for intervenor, Aetna Cas. and Sur. Co.
Before LOTTINGER, COLE and CARTER, JJ.
LOTTINGER, Judge.
This is an action ex delicto resulting from a one-vehicle motorcycle accident in Terrebonne Parish. Cora Naylor, curatrix of her interdicted husband, Roger A. Naylor, filed suit against the Louisiana Department of Transportation and Development ("DOTD") and the Louisiana Department of Public Safety ("DPS"), seeking damages for personal injuries sustained by her husband in this accident. Aetna Casualty and Surety Company ("Aetna"), the workers' compensation carrier for Roger Naylor's employer, intervened in the suit, claiming reimbursement for compensation benefits paid to Roger Naylor as a result of the accident. From judgment of the trial court in favor of plaintiff, both defendants have appealed.[1]

FACTS
From the briefs and the record, we glean the following:
The suit arose from a motorcycle accident occurring August 10, 1977, at about 6:45 p.m. on U.S. Highway 90 in Houma. The accident occurred in a moderately severe curve about one-half mile west of the local Ramada Inn.
Earlier the same day, at about 2:30 p.m., the State Police investigated a one-car accident occurring in the same curve. State Trooper Myron McGlocklin noted an oil spill of unknown origin on the curved roadway. The oil spill affected both lanes of travel for a distance of approximately one hundred feet. The trooper placed twenty-minute warning flares at each end of the curve and requested assistance from the DOTD.
Two representatives of the DOTD, Harold LeBlanc and August Kraemer, arrived on the scene and shoveled sand from the back of a dump truck onto the oil in the road. After covering the oil with sand, the DOTD employees observed traffic for several minutes and left the site, along with Trooper McGlocklin, at about 3:30 p.m.
At about 5:30 p.m., State Trooper Nathan Toups checked the site. He found the sand to be moist and caked with oil, and observed vehicles passing through the curve and having difficulty slowing down and maintaining control. Trooper Toups set out twentyminute flares at each end of the curve and radioed headquarters to request that more sand be brought to the site.
Subsequently, Trooper Lionel Myers arrived at the scene, parking his vehicle behind that of Trooper Toups, on the shoulder of the eastbound lane in the crest of the curve. Shortly after Trooper Myers' arrival, Trooper Toups left the scene. Trooper Myers kept the red rack lights of his vehicle flashing while he waited for DOTD employees to arrive with more sand.
Shortly before 6:45 p.m., Roger Naylor left a convenience store east of the curve on his motorcycle. Mr. Naylor traveled west on U.S. Highway 90 toward the curve. The curve was from right to left in the westbound lane traveled by Naylor. The posted speed was 55 m.p.h., but there was a 30 m.p.h. advisory on the westbound approach.
When Mr. Naylor entered the right-to-left curve, he encountered the sand and oil mixture on the road and the flashing red lights of the police unit on the left shoulder. Approximately ninety feet into the curve, while in the sand and oil, Naylor's motorcycle left the road on the right side and went down a steep embankment, impacting a tree. Mr. Naylor was thrown from the motorcycle and severely injured.
Trooper Myers witnessed the accident and radioed headquarters for an ambulance. He administered first aid to Mr. Naylor, remaining with him until the ambulance *678 arrived some thirty to forty minutes later. Trooper Myers then conducted an accident investigation.
Roger Naylor was taken initially to Terrebonne General Hospital and then to Ochsner Foundation Hospital in New Orleans. Naylor was diagnosed as suffering severe brain contusions. He stayed at Ochsner Foundation Hospital nearly two years, until he was transferred to Coliseum Medical Center in New Orleans. Mr. Naylor was a patient at this facility at the time of trial. Roger Naylor was interdicted on August 23, 1978, and his wife, Cora Naylor, was appointed his curatrix.

TRIAL COURT
Plaintiff asserted liability of DOTD under La.Civ.Code arts. 2315 and 2317, and of the DPS under art. 2315. Both defendants urged the affirmative defenses of contributory negligence and assumption of the risk.
In ruling for the plaintiff, the trial judge found as fact that the sand placed on the oil spill by DOTD employees was slightly moist and contained quantities of small pebbles or "pea gravel"; that the sand and oil mixture was not removed from the road surface prior to Mr. Naylor's accident, nor were any warning signs or flares left at each end of the curve by DOTD employees; that Trooper Myers' vehicle was not visible to westbound traffic until a motorist was in or very near the oil and sand mixture in the curve; that flares set out at about 5:45 p.m. by Trooper Toups were burned out when Trooper Myers arrived on the scene, and neither Trooper Myers nor Trooper Toups set out replacement flares; that the sand in the road was moist and caked with oil; that once Mr. Naylor entered the curve, he momentarily turned his eyes away from the roadway toward the state police unit with its red lights flashing; that witnesses observed slide marks in the oil and sand left by Naylor's motorcycle on the road surface ten to fifteen feet into the oil and sand; that Mr. Naylor had suffered permanent brain damage in the accident and required nursing care 24 hours per day, seven days a week; and that Mr. Naylor suffered severe pain and was conscious of his condition. (For a complete recitation of the trial judge's findings of fact, see Appendix "A" of this opinion.)
From these findings of fact, the trial judge found that the presence of oil, sand, and pea gravel of the magnitude indicated by the evidence and located in the curve constituted a vice or defect of the highway under La.Civ.Code Art. 2317, and that but for the sand, oil, and gravel mixture in the curve, Naylor would not have lost control of his motorcycle. Thus, the vice or defect was the legal cause of damages, and the trial judge found the DOTD strictly liable under Art. 2317.
The trial judge further found that the DOTD breached its duty to maintain a reasonably safe highway and to warn against a dangerous road hazard. Finding that these breaches of duty by the DOTD were a legal cause of Mr. Naylor's accident, the trial judge imposed liability on the DOTD under La.Civ.Code art. 2315.
The trial judge also ruled that the DPS has the duty to provide for the physical safety of Louisiana citizens, and that this duty includes a duty of state troopers to warn of dangerous road conditions of which they are aware. The trial judge held that this duty had been breached and the breach was a legal cause of the accident; thus, the DPS was held liable to plaintiff under La. Civ.Code art. 2315.
The trial judge held assumption of the risk inapplicable as an affirmative defense because there was no indication that Naylor subjectively knew of the oil, sand, and gravel mixture in the curve. The trial judge held that the defendants failed to prove contributory negligence.
Referring to the injuries sustained by Roger Naylor as "devastating," the trial judge awarded plaintiff special damages of $3,036,535.19 and general damages of one million dollars, for a total award of $4,036,535.19, together with legal interest from date of judicial demand as provided by law. The defendants were cast in judgment jointly, severally, and in solido. Aetna, the *679 workers' compensation carrier, received judgment in intervention of $537,825.68, for benefits already paid.
The DOTD was granted a suspensive appeal and the DPS was granted a devolutive appeal from the judgment of the trial court.

SPECIFICATIONS OF ERROR
The defendants-appellants assigned several specifications of error, which can be distilled into the following:
1. The trial court erred in its factual findings as to the speed of the motorcycle, the physical evidence concerning slide marks, and the visibility to Mr. Naylor of the flashing lights on the police vehicle.
2. The trial court erred in its conclusion that the condition of the roadway was a causative factor in the accident.
3. The trial court erred in finding that acts and ommissions of the State Police were a causative factor in the accident.
4. The trial court erred in excluding testimony of an economist offered by defendants, survey maps and aerial photos offered by defendants, and demonstrative evidence and testimony relating thereto offered by defendants.
5. The trial court erred in awarding plaintiff an excessive amount of damages.

ADMISSIBILITY OF EXCLUDED EVIDENCE
At trial in early December, 1979, defendants sought to introduce a survey map of the curve in question, drawn during the trial. Plaintiff objected to the testimony of the engineer who drew the map, arguing that the engineer was not listed as a witness in the pretrial order, and that his inclusion as a witness would cause plaintiff undue surprise and prejudice. On suggestion of counsel, the trial judge called for a continuance of the trial.
When court was again convened eight months later, the trial judge sustained the objection, holding that because the engineer was not listed on the pretrial order, he could not be called to identify the map.
The trial judge further noted that the map was not in existence at the time it was listed in the pretrial order as an exhibit. The survey map and the testimony of the engineer were jointly proffered by the defendants.
The defendants also jointly proffered aerial photographs of the crash site and the testimony of the photographer who, like the engineer, had not been listed as a witness in the pretrial order.
An orderly disposition of each case and the docket and avoidance of surprise are inherent in the theory of pretrial procedure. Eanes v. McKnight, 262 La. 915, 265 So.2d 220 (1972). Much discretion is left to the trial judge in determining whether or not to modify a pretrial order listing witnesses and narrowing issues. Sibley v. Menard, 398 So.2d 590 (La.App. 1st Cir.1980) writ den. 400 So.2d 211 (La.1981). Defendants argue that because the exhibits were listed in the pre-trial order, and both exhibits and the identifying witnesses were available to plaintiff throughout the eight-month continuance, plaintiffs would not suffer undue surprise and prejudice by introduction of this evidence. However, defendants did not attempt to amend the pretrial order during the continuance to list the necessary witnesses. Additionally, several fact witnesses gave verbal descriptions of the accident site, and were examined or cross-examined by the defendants. Because information contained in the survey map and aerial photos (i.e., a description of the accident scene) was already in the record, introduction of these exhibits was not essential "to prevent manifest injustice." La. Code Civ.P. art. 1551. Finding no prejudice to the defendants by the exclusion of the survey map and aerial photos, we cannot say the trial judge abused his discretion in not allowing same into evidence.
Shortly before trial, the DOTD filed an amended pre-trial statement listing Dr. Roger Burford, an economist, as an expert witness. Plaintiff moved the court to delete Dr. Burford from the pretrial order, asserting surprise and prejudice at Dr. Burford's late inclusion as an expert witness.
*680 The trial judge granted the motion. During the long continuance, in January 1980, the DOTD filed a rule to show cause why Dr. Burford should not be allowed to testify when the case was again before the court. The rule was argued in open court and the motion to allow Dr. Burford's testimony was denied. When trial resumed after the continuance, both defendants proffered Dr. Burford's testimony.
We are of the opinion that Dr. Burford's testimony should have been allowed. Even though Dr. Burford was listed but days before trial (and after the discovery cut-off date), plaintiff could have been afforded ample time during the long continuance to depose the defense economist. Other evidence did not exist in the record to render unnecessary Dr. Burford's testimony, as was the situation with the survey map and aerial photos. As a result of the trial judge's refusal to allow defendants to supplement the pre-trial list of witnesses, plaintiff's economist was the only expert to testify as to the plaintiff's multitudinous damages. This is a situation which we find undesirable when the only rationale therefor is strict adherence to court rules. No surprise or prejudice in fact could have been incurred by plaintiff in allowing Dr. Burford's testimony. To prevent the possibility of injustice, the trial judge should have allowed Dr. Burford to be added to the list of witnesses on motion of defendants during the continuance. His refusal to do so amounts to an abuse of discretion under the circumstances.
Trooper Nathan Toups, while under direct examination, was asked to testify as to observations he made during an experiment conducted by defendants' expert witness a short time before trial. The testimony was objected to by plaintiff on the basis of relevancy and competency, and the trial judge sustained the objection. The testimony was proffered. We find that the testimony was properly excluded. We do not question the competency of Trooper Toups to testify as to observations of an experiment he actually witnessed. However, we agree with the trial judge that because the experiment was made under conditions dissimilar to those prevailing at the time of Mr. Naylor's accident, the results thereof have little materiality in determining the cause of the accident. The same reasoning applies to a proffered in-court demonstration of motorcycle skid marks made by a toy motorcycle tracking through talcum powder on a board.
Counsel for the DPS urges remand of this case for introduction of evidence excluded erroneously. Although we find that Dr. Burford's testimony should have been allowed, a remand is not necessary, inasmuch as the entire record is before this court. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). We shall review the record as if Dr. Burford's testimony were a part thereof, see Richard v. Cain, 168 La. 608, 122 So. 866 (1929); Bradford v. Doe, 355 So.2d 613 (La.App. 4th Cir.1978); writ den. 357 So.2d 1156 (La.1978); Stewart v. Zurich Insurance Company, 342 So.2d 1273 (La.App. 4th Cir.1977).

FACTUAL FINDINGS
Defendants-appellants assert that the trial judge committed reversible error in factual findings significant to the outcome of the suit. Under Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); and Canter v. Koehring Company, 283 So.2d 716 (La.1973) an appellate court should not disturb a finding of fact unless it is manifestly erroneous or clearly wrong.
The trial judge found as fact that the police unit of Trooper Myers was parked on the eastbound shoulder in the crest of the curve in a position where its red flashing lights were not visible to the westbound motorist until one was in or very near where the curve began with oil and sand. (See Appendix "A", infra.) Upon arriving, Trooper Myers parked his vehicle directly behind that of Trooper Toups. Trooper Toups testified at trial that his vehicle was visible when motorists got into the curve, but not from seven hundred feet away. He testified that he attempted to park his vehicle where it could be seen from both directions. *681 Testimony from Trooper Toups' deposition was read into the record. In deposition, Trooper Toups stated that one could not see his flashing lights until getting into the curve. Both at trial and in deposition, Trooper Toups stated that there were trees, bushes, and other vegetation growing along the inside of the curve.
Trooper Myers, like Trooper Toups, arrived on the scene from an eastbound direction. His car was farther west than that of Trooper Toups. Trooper Myers did not recall if he walked down to the east end of the curve to check whether his unit was visible from the westbound approach to the curve.
Ricky and Renee Pellegrin traveled westbound through the curve shortly after Mr. Naylor's accident. Renee Pellegrin testified that one could not see the police unit until "... you get right before the curve." She also testified that trees and bushes in yards tended to block one's vision of the left side of the curve. Ricky Pellegrin testified that he could not see the police unit until he was into the curve and into the sand and oil mixture.
Harold LeBlanc of the DOTD arrived at the site for a second time after the accident. By the time he arrived, Trooper Toups had returned to the site to lend aid. LeBlanc testified that he could see the flashing lights of the two police units at about one hundred feet from the curve. He later estimated this distance to be about 600 feet from where the police units were parked.
Joseph Stassi was traveling westbound subsequent to Mr. Naylor's accident when his vehicle collided with the DOTD truck in the curved roadway. Stassi testified that the lights of the police unit were not visible until he was into the curve.
Huey Hebert, the wrecker driver who arrived some time after the accident, testified that he could see the lights of the police vehicles on the scene when he was about halfway between the curve in question and the one which immediately preceded it.
In light of the above, the finding of the trial court that the police unit of Myers and its lights were not visible to a westbound motorist until he was in or very near the curve is not clearly wrong.
The trial judge further found as fact that there were "... slide marks left by Mr. Naylor's motorcycle upon the road surface ten to fifteen feet into the sand and oil." (See Appendix "A" infra.) Ricky Pellegrin testified that he saw a slide mark in this area about three to five feet long and from four to six inches wide. He stated that this mark left the highway at a forty-five degree angle, in alignment with the path left by Mr. Naylor's motorcycle down the embankment on the right side of the highway. The testimony of Huey Hebert was similar, except Hebert perceived the slide mark as being one or two inches wide. Trooper Myers did not observe slide marks and no mention of them appeared in his accident report. Keeping in mind the fact that Trooper Myers did not conduct his accident report until thirty to forty-five minutes after the accident, during which time many vehicles came and left, we do not find the trial judge in manifest error in his factual findings as to slide marks.
The third factual finding argued to be erroneous by the defendants involves the speed of Mr. Naylor's motorcycle at the time of the accident. As will be pointed out subsequently, this factual dispute is immaterial to the issues involved herein.

STRICT LIABILITY
The trial judge held the DOTD strictly liable under La.Civ.Code art. 2317, finding that the oil, sand, and gravel mixture on the highway was a "defect" of the highway which constituted an unreasonable risk of harm. We find art. 2317 inapplicable to the case sub judice. Under Brown v. Winn-Dixie Louisiana, Inc., 417 So.2d 44 (La.App. 1st Cir.1982), a "defect" is some flaw or fault existing or inherent in the thing itself. In Brown, the temporary presence of grains of rice on a supermarket floor was held not to be a "defect" for art. 2317 purposes. In the instant case, the only "defect" found by the trial judge was that *682 created by foreign substances on the curved roadway. Although the record shows that the highway was somewhat bumpy and rutted, there is no indication that bumps or ruts played a causative role in the accident. Thus, art. 2317 has no application herein.[2]

NEGLIGENCE OF THE DOTD
Under the analysis of Dixie Drive It Yourself System New Orleans Co. v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962) and its progeny, four inquiries must be answered in the affirmative before a plaintiff can recover under La.Civ. Code art. 2315.
1. Did the defendant owe a duty to the plaintiff?
2. Was this duty breached?
3. Was the breach of duty a substantial factor in bringing about harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?
4. Do the risk and harm encountered by the plaintiff fall within the scope of the protection afforded by the duty breached?
See also Shelton v. Aetna Casualty and Surety Company, 334 So.2d 406 (La.1976); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); and LeBlanc v. State, Through Department of Corrections, 393 So.2d 125 (La.App. 1st Cir.1980).
As was recently noted in Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982), under traditional negligence concepts, actual or constructive knowledge of a risk of injury gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk. It is well established that the State owes a duty to the motoring public to maintain highways in a reasonably safe condition and remedy conditions which make the roadway unsafe. State Farm Mutual Automobile Insurance Company v. Slaydon, 376 So.2d 97 (La.1979). The duty to remedy arises from knowledge of an unsafe condition of the highway, Kent, supra. Before the State (through the DOTD) may be held liable for an accident caused by a hazardous or dangerous condition, it must be shown that the DOTD had actual or constructive notice of the condition and a sufficient opportunity to remedy the situation or at least warn motorists of its presence, and failed to do so. Slaydon, supra; United States Fidelity and Guaranty Company v. State, Department of Highways, 339 So.2d 780 (La. 1976). The duty to warn is concomitant to the duty to maintain reasonably safe highways and to remedy hazardous conditions, Slaydon, supra; Duffy v. State, Department of Transportation and Development, 415 So.2d 375 (La.App. 1st Cir.1982). The record leaves no doubt that the DOTD was aware of a dangerous oil spill in the curved roadway. Thus, the DOTD owed a duty to remedy the spill or at least warn of its presence.
The DOTD attempted to remedy the oil spill by putting sand on it. However, no more than two hours after the DOTD put sand on the spill, at about 5:15 p.m., the vehicle of Christie Hebert, while traveling west on U.S. 90, entered the curve and slid in the sand and oil. The vehicle did not crash, but spun into the opposing lane of travel (see Appendix "A," No. 9). At 5:30 p.m., Trooper Toups observed vehicles sliding in caked-up sand and oil and having difficulty maintaining control. The sand contained quantities of "pea gravel" or small pebbles, a fact which is unrefuted. The presence of pea gravel probably rendered *683 useless the application of sand, and may have even worsened the traction on the road. Plaintiff's expert, Dr. Robert Brenner, likened pea gravel in the oil and sand to a "walking-on-marbles" situation. Clearly, the DOTD failed to remedy the hazard posed by the large oil spill. Both Harold LeBlanc and August Kraemer testified that they did not place warning signs or "smudge pots" to indicate a hazardous condition in the curve until after the Naylor accident had occurred. We therefore find that the DOTD breached its duty to remedy the hazard or warn of its presence.
The DOTD argues the trial judge erred in finding that the condition of the roadway was a causative factor in the accident. Trooper Myers, the only eyewitness, testified that Mr. Naylor did not skid or fishtail, but rather ran his motorcycle off the road. However, Ricky Pellegrin and Huey Hebert saw a slide mark which corresponded with the visible trail left by the motorcycle across the shoulder and down the embankment. Ricky Pellegrin testified that the skid mark contained white, chalky marks, which Dr. Brenner testified were consistent with a tire sliding over pea gravel. The record is replete with incidents of other vehicles which slid or skidded in the oil, sand, and gravel mixture. We find that plaintiff met her burden of proof that the condition of the roadway was a substantial causative factor in the accident. Likewise, the risk encountered by Mr. Naylor of sliding and losing control of his vehicle was clearly within the scope of protection afforded by the DOTD's duty. Inasmuch as this duty was breached, which breach was a cause-in-fact of the accident, we find the DOTD liable under La.Civ.Code art. 2315.

LIABILITY OF THE DPS
The DPS argues that it is not responsible for dangerous conditions of highways. However, La.R.S. 36:401(B) states:

"The Department of Public Safety, through its offices and officers, shall have authority generally for the security and physical safety of the citizens and property of Louisiana, the enforcement of laws and regulations pertaining to criminal conduct, automobile and highway safety, motor vehicles and drivers, alcoholic beverage control, fire protection, and the administration of emergency preparedness." (Emphasis ours.)
We hold, as did the trial judge, that to protect the physical safety of our citizens, the State Police, as officers of the DPS, have a duty to warn motorists of road hazards of which they are aware.
Both Trooper McGlocklin and Trooper Toups placed twenty-minute warning flares at each end of the curve. However, the flares placed by Trooper Toups at about 5:45 p.m. were burned out long before Mr. Naylor's accident. Neither Trooper Toups nor Trooper Myers replaced these flares prior to the accident. Trooper Myers left his unit lights flashing to provide advance warning of the hazard. However, the flashing red lights of Trooper Myers' unit were not visible to westbound motorists until one was in or very near where the curve began with the sand and oil. Thus, we find that duty to provide advance warning of a known road hazard was breached.
Had proper warning been given, Mr. Naylor could have slowed his vehicle before reaching the sand and oil in the road. Such action might have averted the accident. The positioning of Trooper Myers' vehicle caused Mr. Naylor to turn his eyes left toward the flashing lights which came into view. Unfortunately, the motorcycle reached the oil and sand mixture in the road at almost the same time. Thus, the flashing lights not only failed to provide advance warning, but actually distracted Mr. Naylor at a critical point in negotiating the slippery curve. This was a substantial factor in causing the accident, as is demonstrated by this language from Trooper Myers' accident report:
"Driver was probably distracted by LSP unit C-16 parked on the shoulder, and he (driver) momentarily took his eyes off roadway."
The harm encountered by Mr. Naylor, i.e. losing control of his motorcycle in the oil *684 and sand on the road, was within the scope of protection afforded by the duty of the DPS to warn of road hazards when its officers are aware of them. We therefore find the DPS liable under La.Civ.Code art. 2315.

AFFIRMATIVE DEFENSES
Both defendants pled the affirmative defenses of assumption of risk and contributory negligence. Assumption of risk is not applicable to this case. Under Dorry v. LaFleur, 399 So.2d 559 (La.1981), a plaintiff does not assume a risk of harm unless he knows of the existence of the risk and appreciates its unreasonable character. Mr. Naylor was unable to testify at trial, so there is nothing in the record to indicate his actual subjective knowledge. Although as a matter of law there are some risks that every man must be held to appreciate, Dorry, supra at 563, such is not the case here, inasmuch as the record indicates that the sand and oil was not readily noticeable on the concrete roadway until one was virtually into it.
The defendants argue that Mr. Naylor was contributorily negligent in turning his head, driving too fast under the circumstances, and driving while intoxicated. The trial judge held that defendants failed to meet their burden of proof of contributory negligence.
We agree. The only evidence as to intoxication was that of Trooper Myers, who testified that when he administered first aid to Mr. Naylor, he smelled alcohol on Naylor's breath. However, Renee and Ricky Pellegrin observed Mr. Naylor at the convenience store before the accident. Neither observed stumbling or other signs of intoxication. Renee Pellegrin saw Mr. Naylor load a six-pack of beer into the baggage compartment of his motorcycle. None of the beers were opened. A blood alcohol test was never administered to Mr. Naylor. Thus, we find no proof of his alleged intoxication.
The posted speed for the highway was 55 m.p.h., although there was a 30 m.p.h. advisory for the curve. Trooper Myers, the only eyewitness, estimated the speed of the motorcycle was 55 m.p.h. The trial judge, presumably on the testimony of Dr. Brenner, found as fact that the motorcycle was traveling at 30 m.p.h. when the accident occurred. However, both Dr. I. Robert Ehrlich, defendants' expert witness, and several lay witnesses testified that the curve could be safely negotiated at 55 m.p.h. under normal conditions. Thus, even accepting Trooper Myers' estimate at face value, we find that Mr. Naylor's maintaining a speed of 55 m.p.h. was not negligent under the circumstances, inasmuch as the hazard in the road was not discernible from a distance and no advance warning was given.
Likewise, it was not contributorily negligent for Mr. Naylor to have turned his eyes to look at the police unit's flashing lights when they came into view. Dr. Brenner testified that this was a normal reaction which is instinctive. Trooper Myers admitted that such a reaction was intended, i.e., the lights were flashing so that they would be noticed.
For these reasons, defendants have failed to prove the affirmative defenses raised.

DAMAGES
The trial court awarded plaintiff special damages of $3,036,535.19 and general damages of one million dollars. Defendants-appellants argue that the damages awarded are unreasonably and oppressively high.
The medical evidence leaves little doubt that the injuries suffered by Mr. Naylor are of a most severe nature. Dr. Homer Kirgis, the neurosurgeon who treated Mr. Naylor, testified that as a result of the accident, Mr. Naylor received severe contusions of the brain. Mr. Naylor stayed in the intensive care unit at Oschner Foundation Hospital for six weeks. During this stay, Mr. Naylor required general supportive measures and an endotracheal tube was placed into his trachea to facilitate breathing. On September 2, 1977, he underwent bilateral skull trephination, a surgical process in which small openings are made in the skull to *685 drain undue accumulations of fluids between the surface of the brain and the undersurface of the skull.
The contusions to the brain suffered by Mr. Naylor involved the brain stem, an area important to respiration, heart function, and other automatic functions. Additionally, Dr. Kirgis stated that Mr. Naylor received damage to both hemispheres of the brain, causing dysfunction to both sides of the body. The accident caused interruptions in the connections from the brain stem to the cerebral cortex, involved in the thinking process. Thus, Dr. Kirgis testified that it is impossible for Mr. Naylor to tend to himself, since his injuries have caused a loss of motor coordination. Damage to the brain stem itself causes Mr. Naylor to have problems breathing and in relieving his bladder and bowels, which he cannot control. Dr. Kirgis testified that Mr. Naylor had already reached a plateau in recovery, and would not likely recover further. Dr. Delavasio, who attends Mr. Naylor at the Coliseum Medical Center, corroborated Dr. Kirgis as to Mr. Naylor's inability to function on his own and his need for twentyfour hour nursing care. Dr. Delavasio also stated that Mr. Naylor's injuries have caused a functional blindness in his right eye, in which the optic nerves have simply ceased to operate.
Although Mr. Naylor suffers dysfunction to both sides of his body, Dr. Kirgis testified that not all the connections between the brain stem and the cerebral cortex have been interrupted. Thus, Mr. Naylor is able to feel physical discomfort and pain. Mr. Naylor is more susceptible to colds and upper respiratory infections because of his tracheostomy tube; however, Dr. Kirgis testified that he cannot close the throat incision, fearing that Mr. Naylor's inability to clear his throat without the tube would prove life-threatening. Mr. Naylor has had recurring bladder infections, which are very painful. Dr. Kirgis testified that Mr. Naylor feels the pain and grimaces. Additionally, although Mr. Naylor has lost part of his thinking process, he still experiences emotions, which manifest themselves by Mr. Naylor's occasional depression and crying. Mrs. Naylor corroborated this testimony, stating that her husband often cried in her presence and averted his eyes as if ashamed of his condition. Ms. Betty Connors, one of three nurses assigned to Mr. Naylor, has also seen Mr. Naylor cry on occasion. She also testified that Mr. Naylor sometimes smiled, especially when listening to tapes of himself playing the guitar prior to the accident.
The brunt of the medical testimony is that Mr. Naylor has suffered severe brain damage which renders him virtually helpless. He requires constant care, and is unable to tend to his feeding, bathing, and toilet by himself. He is unable to speak and has lost sight in his right eye. However, despite his lack of motor coordination and mental coherence, Mr. Naylor is conscious of his condition, experiences frequent and severe pain due to his recurrent infections, and suffers mental anguish and depression due to his inability to care for himself and his family. He is not likely to ever improve from his present condition. Under these circumstances, we are unable to say that the trial judge abused his much discretion in awarding plaintiff one million dollars in general damages.
The defendants raise the argument that the high general damages awarded by the trial court are inappropriate, inasmuch as Mr. Naylor will probably never be in a position to enjoy and appreciate them. However, the record indicates that Mr. Naylor recognizes the members of his family and is anguished by his inability to care for them. If Mr. Naylor can be made to understand that his wife and children are financially secure in the years to come, this knowledge will alleviate significantly Mr. Naylor's present emotional turmoil.
In the area of special damages, the trial court followed the uncontradicted testimony of plaintiff's economic expert, Dr. Seymour Goodman, in awarding special damages of $3,036,535.19, which defendants contend is excessive. However, since we find that the expert testimony of Dr. Roger Burford should have been admitted into evidence, *686 we shall consider the testimony of both experts in reviewing the trial judge's special damages award.
At the time of the accident, Mr. Naylor was fifty-five years old. He was employed by Smit-LeCler International Corporation as an engineer involved in the development of decompression tables, which required frequent decompressive diving by Mr. Naylor. Plaintiff described her husband as an active and lively man who did not intend to retire until he was unable to continue working.
In determining Mr. Naylor's lost future earnings, both economic experts used as a base figure Mr. Naylor's earnings in 1977 through August (when the accident occurred), which were $19,274. Dr. Goodman "annualized" the partial 1977 earnings for a yearly future income of $30,904.86. Based on a retirement age of 70, and after calculating in a growth rate for earnings (gradually decreasing from 8.85% to 4.52%) and a 6.5% discount rate for present value, Dr. Goodman determined lost future wages were $355,881.54, which sum was awarded by the trial court.
Dr. Burford declined to "annualize" the partial 1977 earnings because these partial earnings were greater than Mr. Naylor's total earnings in both 1975 and 1976. Dr. Burford used the partial 1977 earnings as future annual income. Based on a worklife of 8.12 years (the national average for offshore workers of Mr. Naylor's age) and a 6.8% growth rate and a 7% discount rate, Dr. Burford calculated lost future earnings of $177,164.
We find the sum awarded by the trial court for lost future earnings was appropriate. Under Folse v. Fakouri, 371 So.2d 1120 (La.1979), damages for lost future earnings or loss of future earning capacity should be based on the injured person's ability to earn money, rather than on what he actually earned prior to the injury. The record does not indicate that Mr. Naylor would not have continued to earn money from August through December of 1977, had not the accident occurred. Thus, Dr. Burford's reliance on 1975 and 1976 earnings in forming an annual future income was contrary to Folse, supra, and we find that Dr. Goodman's "annualized" 1977 earnings more accurately represented Mr. Naylor's annual earning capacity. Thus, we find no error in the trial court's award for lost future earnings.
Dr. Goodman also used the "annualized" 1977 earnings of $30,904.86 to compute lost past earnings (between the date of the accident and the trial) of $78,295.53, which was awarded by the trial court. Dr. Burford did not testify as to this item of damages, and we find no error in the sum awarded.
Regarding future hospitalization costs, both economists used as a base figure a bill from Coliseum Medical Center for the period from June 28 through October 25, 1979, in the amount of $9,613.30. From this figure, Dr. Goodman computed a monthly hospital cost of $2,462. Based on 18.2 year life expectancy from date of trial (December 5, 1979) and calculating in a 6.05% growth rate for hospital costs and a 6.5% discount rate, Dr. Goodman found future hospital costs of $529,437.79.
Dr. Burford eschewed the monthly rate arrived at by plaintiff's expert, pointing out that the amount of the bill broken down over the number of days billed equalled $76.30 per day hospital costs. However, Dr. Burford deemed $50.00 per day to be reasonable hospital costs and used same in his computations. Based on a 15 year life expectancy, and using the same cost growth rate as did Dr. Goodman and a 7% discount rate, Dr. Burford found $256,229 for future hospital costs.
We find that Dr. Goodman's estimated hospital costs formed the basis for an appropriate award by the trial judge. The 18.2 year life expectancy used by Dr. Goodman was taken from actuarial tables, as opposed to the 15 year life expectancy stated by Dr. Burford to be reasonable.
As for future nursing costs, it was undisputed at trial that Mr. Naylor required constant, round-the-clock nursing care. Ms. Betty Connors, one of Mr. Naylor's three nurses, testified that she was paid $60.00 for a daily eight-hour shift, and that she *687 received a $5.00 per day raise every six months. Dr. Goodman used the biannual five-dollar raise in calculating future nursing costs, and based on the 18.2 year life expectancy, he computed future nursing costs of $1,607,992.22, after discounting at 6.5%. Dr. Burford did not calculate in the biannual five dollar raise, but rather used an annual growth rate of 6% which, based on the 18.2 year life expectancy, yielded future nursing costs of $1,099,144, after discounting at 7%.
We are of the opinion that the award of the trial judge for future nursing costs, which was based on the testimony of Dr. Goodman, is altogether too speculative to be upheld. Although Ms. Connors testified that she was accustomed to receiving a $5.00 per day raise every six months, and she expected to receive similar raises in the future, the prospect of such continual raises is wholly uncertain, especially if extended over a period of eighteen years. Dr. Burford took into account an annual growth rate for nursing costs which was not contingent on a speculative series of future raises, and we therefore find his estimate of future nursing costs a far more appropriate amount for such an award. Judgment will be amended accordingly.
On the opening day of trial, December 5, 1979, all parties stipulated that Aetna, the compensation intervenor, had paid on behalf of Mr. Naylor $295,208.36 in past medical expenses through November 30, 1979. Subsequent to trial, the parties filed a joint stipulation stating that through February 18, 1981, Aetna had paid $464,928.11 in medical expenses on behalf of Mr. Naylor. The latter sum was awarded to plaintiff by the trial court as past medical expenses. We find this award is erroneous. The economic expert relied upon by the trial court calculated future medical expenses from the opening day of trial, December 5, 1979. The trial court's award of future medical expenses covered expenses incurred during the time period between December 5, 1979 and February 18, 1981. An award of the same expenses (i.e., those incurred between December 5, 1979 and February 18, 1981) as past medical expenses would result in double recovery for the plaintiff. We therefore find plaintiff can recover only $295,208.36 as past medical expenses. Judgment shall be amended accordingly.
For the above reasons, we amend the trial court's award of special damages to $2,357,967.22.

INTERVENTION
At trial, the parties stipulated that if judgment was rendered for plaintiff, then Aetna, the compensation intervenor, would receive a preference in the judgment for all amounts paid on behalf of Mr. Naylor prior to the date judgment became final. The judgment of the trial court awarded the intervenor a preference for all amounts paid on behalf of Mr. Naylor prior to the date of the satisfaction of the judgment, following Billeaud v. United States Fidelity & Guaranty Company, 349 So.2d 1379 (La. App. 3rd Cir.1977). The judgment stated that this amount, through July 16, 1981, was $537,825.68. While this matter was pending before this court, we were informed, as per stipulation of counsel at trial, that as of August 17, 1982, Aetna had paid $750,477.48 on behalf of Mr. Naylor. Judgment in favor of intervenor will be amended accordingly.

DECREE
Therefore, for the above and foregoing reasons, the first two decretal paragraphs of the judgment of the trial court are amended to read as follows:
"IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Cora Naylor, curatrix of the interdict, Roger A. Naylor, and against the defendants, the Louisiana Department of Transportation and Development and the Louisiana Department of Public Safety, jointly, severally and in solido in the full true sum of THREE MILLION, THREE HUNDRED FIFTYSEVEN THOUSAND, NINE HUNDRED SIXTY-SEVEN AND 22/100 ($3,357,967.22) DOLLARS.

*688 "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of intervenor, Aetna Casualty and Surety Company and against the defendants, the Louisiana Department of Transportation and Development and the Louisiana Department of Public Safety, jointly, severally and in solido in the full sum of the amount Aetna Casualty and Surety Company has actually paid, or will pay prior to the date of the satisfaction of this judgment, to or on behalf of Roger A. Naylor as weekly workmen's compensation benefits and medical expenses (which sum, as of August 17, 1982, was $750,477.48), to be paid to Aetna Casualty and Surety Company by preference and priority out of the principal sum awarded herein to plaintiff."
As amended by this court, and in all other respects, the judgment of the trial court is hereby affirmed. Costs in the trial court and this court, in the amount of $5,659.37, are assessed to defendants-appellants, the Louisiana Department of Transportation and the Louisiana Department of Public Safety.

AMENDED AND AFFIRMED.
COLE, J., dissents, but only insofar as finding liability on the part of Louisiana Department of Public Safety.
 APPENDIX "A"
CORA NAYLOR, CURATRIX OF THE * 32ND JUDICIAL DISTRICT COURT
INTERDICT, ROGER A. NAYLOR *
 *
VERSUS NO. 54379 * STATE OF LOUISIANA
THE LOUISIANA DEPARTMENT OF *
TRANSPORTATION AND DEVELOPMENT *
and THE LOUISIANA DEPARTMENT *
OF PUBLIC SAFETY * PARISH OF TERREBONNE

REASONS FOR JUDGMENT
I. FINDINGS OF FACT
1. On Monday, August 8, 1977, Mr. Roger Naylor left his home in Gibson, Louisiana, astride a 1974 Harley Davidson motorcycle and rode in an easterly direction to work in Harvey, Louisiana, where he stayed until Wednesday, August 10, 1977.
2. On Wednesday, August 10, 1977, a large quantity of oil was spilled in the curve of U.S. Highway 90, west of the Ramade Inn of Houma. At 2:30 p.m. Mr. Louis Britisch entered the curve traveling west while in his pickup truck, lost control in the oil, and crashed down the steep westbound embankment.
3. The State Police were notified and Trooper McGlocklin arrived at the scene of the Britisch accident within minutes. Trooper McGlocklin observed the oil on the curved roadway, placed 20 minutes flares at each end of the curve to warn approaching motorists, then requested that the Highway Department be notified. Trooper McGlocklin noted that the oil spill measured approximately 100 feet and covered nearly both lanes of travel.
4. I find that Mr. Harold LeBlanc was the maintenance superintendent in training and received the notification of the oil spill. Mr. LeBlanc had no training nor experience in handling oil spills of this nature.
5. I find that although many employees were available, Mr. LeBlanc chose to call only upon Mr. August Kramer, a long time Highway Department employee, to assist him. A Highway Department dumptruck was filled with sand and driven to the oil spill site.
6. I find that the sand that was hauled to the oil spill site was slightly moist and contained quantities of small pebbles or "pea gravel".
*689 7. LeBlanc and Kramer reached the oil spill site around 3:00 o'clock p.m. and Kramer shoveled out sand onto the oil spill while LeBlanc slowly moved the truck forward. Thereafter, LeBlanc observed the sand for several minutes, drove the dumptruck through the area, then at about 3:30 p.m. left the site of the spill along with the state trooper.
8. I find that the sand and oil mixture was not removed from the road surface, nor were any warning signs or flares left at either approach to the curve.
9. At approximately 5:15 p.m., Ms. Christie Hebert of Houma was traveling west on U.S. Highway 90 and entered the affected area of the curve. Her vehicle began sliding in the oil and sand, and stopped after spinning into the eastbound lane.
10. At approximately 5:30 p.m., Trooper Toups came upon the curve to check the site for Troop Headquarters. Trooper Toups noted that the oil had seeped up through the sand, the sand was moist, and caked with oil. He noted that vehicles passing through the sand and oil were applying their brakes and incurring difficulty with maintaining control.
11. Before calling headquarters, Trooper Toups set out 20 minutes flares at each end of the curve to warn approaching motorists of the slick condition. At 5:46 p.m., Trooper Toups radioed headquarters to request that more sand be brought to the site.
12. Between 5:15 and 6:30 p.m. Trooper Myers traveling east on U.S. Highway 90 arrived upon the scene, parked his vehicle behind Trooper Toups on the shoulder of the eastbound lane, and relieved Trooper Toups of his duties.
13. I find that Trooper Myers' vehicle was visible to eastbound traffic but was not discernible to westbound traffic until the motorist was in or very near where the curve began with oil and sand. The flares which Trooper Toups placed at the approaches to the curve prior to 5:46 p.m. were of 20 minutes duration and were burned out by the time Trooper Myers arrived. I find that no replacement flares were set out by either Trooper Myers or Trooper Toups.
14. At approximately 6:30 p.m. Mr. and Mrs. Ricky Pelligrin traveled to a small convenience store east of the curve and noted the presence of Mr. Naylor on his motorcycle. Neither observed any signs which would suggest any sort of alcohol induced impairment.
15. Shortly before 6:45 p.m., Mr. Naylor left the convenience store east of the curve, and rode his motorcycle west on U.S. 90 in the direction of the oil and sand laden curve.
16. I find that the enforceable speed limit in the area of the curve was 55 miles per hour. However, on the westbound approach to the curve, a 30 mile per hour speed advisory sign was in existence.
17. I find that once Mr. Naylor entered the curve, he momentarily removed his eyes from the roadway and turned his eyes in the direction of Trooper Myers' police unit with its rack lights flashing. Mr. Naylor attempted to slow down, began sliding in the oil and sand, lost control of his motorcycle and crashed into a tree located down and on the steep westbound embankment.
18. After evaluating the credibility of the witnesses presented, I find that the evidence, although conflicting, indicates that Mr. Naylor was traveling at or very near 30 miles per hour as he entered the curve.
19. Trooper Myers witnessed the accident and radioed headquarters to request an ambulance. I find that not until the ambulance left with Mr. Naylor some 30 to 45 minutes later did Trooper Myers begin his investigation. During this interim, Mr. Pelligrin arrived upon the scene as did Mr. Huey Hebert, the wrecker truck driver, both of whom noted the slide marks left by Mr. Naylor's motorcycle upon the road surface ten to fifteen feet into the sand and oil.
20. After Mr. Naylor's accident, the Highway Department arrived again and spread sand over the affected area. This *690 time the need for warning signs was recognized and they were placed at each approach to the curve, but not before Mr. Michael Stassi entered the curve and collided with the Highway Department dumptruck.
21. Thereafter, Trooper Myers caused the local fire department to hose off the sand and oil from the curve. No other accidents occurred thereafter.
22. I find that Mr. Naylor suffered severe, permanent brain damage in the accident, which will require that he spend the rest of his life in an extended health care facility. Additionally, I find that he will require nursing care 24 hours per day, seven days a week.
23. I find that Mr. Naylor was highly educated and trained, and was gainfully employed at a substantial wage. Because of his special expertise, I find that Mr. Naylor would have worked beyond the normal expected age of retirement.
24. I find that Mr. Naylor suffers severe pain at times and is conscious of his condition.
NOTES
[1] The DOTD filed a third-party demand against Goldrus Drilling Company, which was dismissed on a motion for summary judgment prior to trial. This dismissal is not an issue on appeal.
[2] We have considered also whether "pea gravel" in the sand used by the DOTD might be considered a "defective" quality of the sand, giving rise to the possibility of art. 2317 liability. However, as was recently discussed in Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982), strict liability merely frees a plaintiff from proving the defendant's actual or constructive knowledge of the risk of harm. Thus, the determination of liability is the same as that for ordinary negligence, i.e., did the thing pose an unreasonable risk of harm, and did the defendant take reasonable steps to alleviate the risk? Since the testimony of the DOTD employees indicates that they actually knew of the quantities of "pea gravel" in the sand, we find it unnecessary to enter into an art. 2317 analysis of the sand itself in order to determine liability of the DOTD.