WILLIAMS, Judge.
Plaintiff was injured on October 20, 1976 while operating an elevator in Orleans Parish Prison. Plaintiff filed two suits against her employer at the time of the injury, the Orleans Parish Criminal Sheriff’s Office, one in tort and one based on worker’s compensation. The worker’s compensation suit was dismissed by stipulation of the parties.[1]
At the close of plaintiff’s case (in tort), the trial court granted the exception of no cause of action filed by the City of New Orleans, thereby dismissing the Criminal Sheriff’s Office as a defendant. The court rendered judgment against Criminal Sheriff Charles Foti, finding him negligent in assigning plaintiff to an elevator which was extremely hard to operate. Charles Foti appeals. We reverse.
FACTS
Edna White was employed by the Orleans Parish Criminal Sheriff’s Office in May, 1974. Ms. White was assigned at various times to the House of Detention, the Criminal District Court, and the old Parish Prison, where she worked as a property control officer, receiving packages for inmates.
On October 18, 1976, Ms. White was assigned to operate the Orleans Parish Prison elevator.[2] Ms. White operated the elevator *641 on October 18, 1976 without incident, though she testified she was very tired. The next day she experienced no problems, although she wore gloves to work in order to protect her hands. Plaintiffs injury occurred the third day she operated the elevator. On October 20, 1976, plaintiff began operating the elevator at 6:45 a.m. At approximately 10:00 a.m., Ms. White felt a pain from her neck into her shoulder. She reported the pain to her Watch Commander, who instructed her to go to the medical department. After spending fifteen minutes in the medical department, Ms. White felt numbness in her fingers and arms. She was sent to Charity Hospital.
Dr. Eisenhauer examined plaintiff and gave her the following note:
Edna White was seen at Charity Hospital 10/20/76 & has muscle spasm of shoulder & neck. This will require bed rest until improved.
Plaintiff stayed home five days. Plaintiff again reported to work on October 25, 1976. She gave the doctor’s note to her Watch Commander, Sgt. Wilfred Washington. Though she was still in pain, plaintiff did not so inform Sgt. Washington. Sgt. Washington told Ms. White she was assigned to operate the elevator.
After operating the elevator for approximately 27⅛ hours, plaintiff experienced the same pain as five days earlier, but more severe. She returned to Charity Hospital and was examined by Dr. George Linder who gave her the following note:
Patient treated at CHNO for muscle spasm [right] shoulder & neck area. Should be able to work in some area other than elevator which requires use of [right] arm.
Plaintiff immediately returned to work and gave the note to Sgt. Washington, who instructed her to go home. Plaintiff returned to work on November 2, 1976 at the request of a Captain Kneed, apparently to supervise an inmate at Charity Hospital. The same day, Captain Carolyn Foster attempted to schedule plaintiff to work a shift from 7 p.m; to 7 a.m. However, plaintiff informed Captain Foster that she was on medication and did not believe she could remain awake during those hours. Unable to accept the position offered, plaintiff returned home.

Discussion

Before plaintiff can recover from defendant, she must show that defendant owed a duty to plaintiff, that the duty was breached, that the breach was a substantial factor in bringing about the harm to plaintiff, and that the risk and harm encountered by plaintiff were in the scope of the protection afforded by the duty breached. Naylor v. Louisiana Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982), writ den., 429 So.2d 127, 134 (1983).
Though defendant admits that he owed to plaintiff the duty to provide a reasonably safe workplace, he denies that he breached this duty. Further, if any breach did occur, it was not a substantial factor in causing plaintiff’s injury.

Breach of Duty

The crux of plaintiff’s argument is that the elevator was extremely hard to operate.[3] She stated that the door on the *642 third floor was the most difficult to operate. When asked how the elevator was broken or what the defective condition was, plaintiff replied:
A. “Pulling down on this cross bar handle that was broken off and it was hard to pull down, like I said, I had to use both hands to pull down on the handle.”
Defendant argues that plaintiff failed to prove that the elevator was so hard to operate that it amounted to a defect. Defendant further complains that plaintiff failed to prove that the elevator was defective in design or condition, or that Sheriff Foti knew or should have known that plaintiff might be injured while operating the elevator. See Naylor v. Louisiana Department of Public Highways, 423 So.2d 674, 682 (La.App. 1st Cir.1982), writ den., 429 So.2d 127, 134 (1983).
The trial court’s Reasons for Judgment explain the basis of imposition of liability upon defendant:
“From all the evidence, this Court concluded that Ms. White’s injury was caused by her operating the prison elevator. All Watch Commanders had notice that the elevator was in disrepair, and strenuous to operate. Based on this information, it was not a usual practice for Watch Commanders to assign female deputy sheriffs to operate the elevator.”
We find the record fails to support the trial court’s conclusions, and that the judgment is incorrect as a matter of law. The testimony clearly indicates that it was not an unusual practice to assign a female to operate the elevator. Furthermore, the testimony indicates that operation of the elevator was not so difficult to operate that it amounted to a defective condition. However, even if the elevator had been difficult to operate, the defendant had neither actual nor contructive notice of a dangerous condition resulting in plaintiff’s injury.
Gerard J. Hoffman was employed as an electrician for the Orleans Parish Prison in April of 1976, and was still employed by the Criminal Sheriff’s Office through the time of trial. When asked in a deposition who operated the elevator in question, Mr. Hoffman responded: “Anyone associated with the sheriff’s office; men or women.” Mr. Hoffman stated that he had seen female employees of the sheriff’s office operate the elevator. However, he knew only the name of one of the women, Pena, who worked in the record room on the third floor.
Mr. Hoffman further stated in deposition that the problems with the elevator usually involved an electrical short on the roof or a problem with a switch. When these problems occurred, the elevator would simply stop running. He stated that tape had been placed on the lever on the third floor to cover the weld to avoid injury to the operator’s hands, and the tape was already on the lever when his employment with the Orleans Parish Prison began. Mr. Hoffman worked a twelve hour shift, from noon until midnight, in 1976, and he operated the elevator in 1976 “[pjrobably every night [he] wanted to go up to a floor.” He stated the door on the third floor operated the same way as the other doors. Mr. Hoffman further stated that the elevator continued to be in service five to ten years after 1976.
Sergeant Wilfred Washington, an employee of the Criminal Sheriff's Office for almost twenty years as of the date of trial, was assigned to Orleans Parish Prison during 1976 and worked as a Watch Commander at times during that period. He was familiar with the elevator in question. Sgt. Washington testified that he had operated the elevator and never had any difficulty in doing so. He stated that the elevator was not always in constant use, but the use varied depending on the traffic in the jail. He further testified that there were not many assignments which were considered lighter duty than operation of the elevator. Further, though he was not certain of the number, Sgt. Washington had seen a few female deputies operate the elevator in 1976.
Lieutenant Dennis Darensbourg, an employee of the Criminal Sheriff’s Office for approximately fifteen years at the time of trial, used the elevator in Orleans Parish Prison constantly during 1976. Darens-bourg testified that although the elevator *643 door required a certain amount of strength to operate, the door slid on a track which made it relatively easy.
Darensbourg testified that he was aware of two females in addition to Ms. White who had operated the elevator during the pertinent time.[4] Darensbourg’s testimony as to whether he personally assigned a female to operate the elevator while he was a watch commander (during the years 1977-1987) is ambiguous:
THE COURT:
How many times did you sign [sic] a female to operate the elevator?
THE WITNESS:
Various times. We use a female mostly — we couldn’t use them in positions on the tier because it was basically a men facility and we would use the females in none [sic] security position like in the tower and other positions like that, none security positions. That’s basically the only position we could use female [sic] in.
THE COURT:
On how many occassions did you assign a female to operate the elevator? THE WITNESS:
I don’t recall ever assigning any.
THE COURT:
You’ve never assigned a female to operate the elevator?
THE WITNESS:
I don’t think there were any females assigned to my particular division. I don’t recall it, anyway.”
It appears that Lt. Darensbourg did not recall having any females assigned to his division. If the lieutenant had no females to assign to any position, he certainly could not assign a female to the elevator. He does not state that he would not have assigned a female to the elevator.
Philip Ganier, Sr. was employed by the Criminal Sheriff’s Office from 1972 until 1979. Mr. Ganier operated the elevator in question from time to time from 1974 through 1977. His testimony also indicates that females were allowed to operate the elevator, except when the third floor lever was broken:
“The lever that you would pull down would have broken and we operated handles, males, operated the handles temporarily ...”
Mr. Ganier testified that operation of the elevator was a tiresome job: the levers on the elevator doors were manually operated, at times the door would jamb, and the elevator was in constant use throughout the day. Also, there were occasions when the elevator was out of service for weeks and everyone was required to use the stairs. Mr. Ganier testified that the bolts on the lever used to open the elevator door would often loosen up, and at one point the lever broke.
We note that Ms. White did not allege that the door had jambed on the day of her injury. Also, the testimony indicates that the broken lever had already been fixed, by tack-welding, at the time Ms. White began operating the elevator. Thus, it appears that she was not subjected to additional strain due to a shortened lever.[5]
Finally, Ms. White testified that she was aware of a female who operated the elevator, Ms. Elsie Ellis, during the time that she (plaintiff) was working at the Broad Street gate, prior to her assignment to the elevator. Ms. Ellis operated the elevator for approximately two days. Plaintiff stated that Ms. Ellis then became sick and entered the hospital. There is no indication that the illness was related to operation of the elevator. Ms. Ellis returned and was reasssigned to the House of Detention. Analysis
It is clear that the trial judge’s conclusion that “it was not a usual practice for Watch Commanders to assign female deputy sheriffs to operate the elevator,” is not supported by the record. Furthermore, the *644 record indicates that plaintiff failed to prove that the defendant knew or should have known that the elevator was in such a dangerous condition that its operation by plaintiff or any other female could result in this type of injury.[6] There was no allegation that any other female had ever been injured while operating the elevator, thereby putting the defendant on notice.
The trial court judgment was also apparently based on plaintiffs re-injury on October 25, 1976 when plaintiff returned to work. The trial judge states in her Reasons for Judgment:
When she returned to work on Monday, October 25,1976 Ms. White gave the October 20th note to Sgt. Washington, her supervisor, and requested light work. She was ordered to return to work the elevator. It was gross negligence to reassign plaintiff to this strenuous duty on October 25, 1976, following a complaint of injury on October 20, 1976.”
The court’s statement that Ms. White requested light work on October 25, 1976 is not supported by the record. Ms. White’s testimony regarding her return to work on October 25 is as follows:
Q. And you showed him [Sgt. Washington] the note:
A. Yes.
Q. And what were your directives then as far as what to do?
A. He told me I was ordered to work the elevator. He ordered me to work the elevator.
A. And what did you tell him at that time?
A. I showed him the note.
Q. Did you object to going back to work at the elevator?
A. He told me I would have to work the elevator so I told him okay I would go on and try it. It was either that or I couldn’t work.
Q. And when you say you couldn’t work, what do you mean by that?
A. My assignment he told me was the elevator when I gave him the first note. I was assigned to the elevator, that was the only place I could work.
The note plaintiff presented to Sgt. Washington simply states that Ms. White is to rest in bed until her condition improved. Plaintiff did not give defendant any indication on October 25, 1976 that she was unable to operate the elevator and that her condition had not sufficiently improved. She did not request light work.
Ms. White also testified that she was in pain when she returned to work on October 25, 1976, but she did not notify defendant of this condition. Only plaintiff was aware that her condition had not improved sufficiently and that she should not have resumed operation of the elevator.[7]
We find the trial court abused its discretion in finding the defendant grossly negligent in reassigning plaintiff to the elevator on October 25, 1976.
For the reasons assigned, the judgment of the trial court imposing liability upon defendant for injuries incurred by plaintiff is reversed.
REVERSED.
PLOTKIN, J., dissents with reasons.

. At the time of plaintiffs injury, employees of the Criminal Sheriff's Office were not covered under the Louisiana Worker’s Compensation Act, LSA-R.S. 23:1034 et seq.

. The elevator serves the four floors of the building. Each floor has its own door to the elevator. There are two bars across each door. These bars ("crossbars”) are connected in a seis- *641 sors fashion and form a wide "V” when the door is open. The bars are connected at the bottom of the "V” with a bolt, and the top of each bar (at each end of the "V”) is connected to the edge of each side of the door. A vertical lever on the bar on the right is used to open and close the door. From inside the elevator and facing the door, the operator stands to the left of the vertical lever. To open the door, the lever is pulled toward the operator (usually with the right hand). The lever is pushed away from the operator to close the door, causing the crossbars to open and form the wide “V”. A small handle inside and on the left side of the elevator controls the vertical movement from floor to floor.

. Plaintiff alleges two defects in the elevator which she effectively admits did not cause her injury. She complains that the adhesive tape on the third floor lever was insufficient to protect the operator from getting cuts and blisters on his or her hands. The third floor lever had been broken and welded back together. However, plaintiff also testifies that she wore gloves to protect her hands and the injury complained of does not involve cuts or blisters on the hands.
Plaintiff also complains about the bare walls in the elevator but she expressly states that this condition was not related to her injury.

. Though Darensbourg could not remember the names of both of these women, he believed that one of the women was Sandra Davis.

. Although plaintiff testified that the third floor lever was very difficult to operate and also testified that her pain started after she pulled a lever, she never states that her injury resulted from pulling the third floor lever.

. Ms. White was 5'10" tall and weighed 130 lbs. only several months after her injury.

. We note that there is no indication that Ms. White would have been reprimanded or fired if she had refused to operate the elevator due to her previous strain. Ms. White was immediately released from her duty and sent to a doctor, without reprimand, each time she complained of pain.