Court composed of ULYSSES GENE THIBODEAUX, JOHN D. SAUNDERS, and MICHAEL G. SULLIVAN, Judges.
11 SAUNDERS, Judge.
This matter is an appeal from the jury’s finding that the State of Louisiana, through the Department of Transportation and Development (DOTD) was not at fault in the death of Mr. David Billings. For the reasons that follow, we affirm the decision of the jury.

FACTS

On March 31, 1993, at approximately 2:15 a.m., David Billings was driving a 1986 Ford Thunderbird, traveling east on Interstate 10, near Duson in Lafayette Parish. While he was driving, Mr. Billings fell asleep. His Thunderbird’s right wheels left the road, traveling on the grassy area adjacent to the shoulder near the 95 milepost on Interstate 10 at its intersection with the La. Hwy 724 overpass. The Thunderbird then made contact with the guardrail near the bridge overpass, and at some point, traveled up the guardrail as if it were a ramp. The Thunderbird then flipped over and struck a concrete post supporting the overpass.
The wreck caused extensive damage to the Thunderbird and massive injuries to Mr. Billings. As rescuers struggled to remove him from the Thunderbird, Mr. Billings told them that he had fallen asleep. Then, he lost consciousness and died a short while later.
An autopsy revealed Mr. Billings had used marijuana and alcohol prior to the accident. Mr. Billings’ blood alcohol level was .073 at the time of the autopsy.

PROCEDURAL FACTS

David Billings’ wife, Paula Billings, brought suit, individually and on behalf of her minor children, David Allen Billings, Monte Christopher Billings, and Jonathan Everett Billings on January 19, 1994, against DOTD. Mrs. Billings alleged | Jhat she and her children were entitled to wrongful death and survival damages because of the death of her husband David Billings. A jury trial on the merits was held from August 14, 2000 to August 18, 2000. At the end of the trial, the jury found that DOTD was not at fault for the death of David Billings. It is from this judgment that Mrs. Billings has filed the instant appeal.

*1136
LAW AND ANALYSIS

ASSIGNMENTS OF ERROR
On appeal, Mrs. Billings makes the following assignments of error:
1. The trial judge erred in permitting the introduction of Mr. Billings’ misdemeanor conviction because that document was not listed by DOTD on its pretrial exhibit list.
2. The trial judge erred by allowing the introduction of a misdemeanor conviction to be used to impeach Mrs. Billings’ economic evaluation.
3. The trial judge erred by permitting the introduction of evidence of Mr. Billings’ misdemeanor conviction because of unfair prejudice.
4. The trial judge erred by permitting any introduction of evidence of Mr. Billings’ misdemeanor conviction.
5. The trial judge erred in excluding the expert testimony and video of Jeff Galpin as being unsupported by a scientific foundation.
6. The trial judge erred by refusing to allow Mrs. Billings to examine DOTD’s expert as to the expert’s bias.
7. The trial judge erred in allowing Dr. Joseph Blaschke to testify as to the effects of modified guardrails on the Billings’ car.
8. The jury erred in not finding DOTD at fault.
9. The jury erred in not awarding damages for the wrongful death of David Billings.
UlO. The jury erred in not awarding damages for the survival actions of Mrs. Billings and her children.
MISDEMEANOR CONVICTION
As the first four assignments of error are related, we will address these four assignments of error together. Essentially, Mrs. Billings argues that the trial judge erred when it allowed her husband’s misdemeanor conviction for possession of marijuana into evidence. Her argument regarding this error is twofold. First, she asserts that the trial judge should not have allowed the evidence to be admitted because DOTD did not place it on its pretrial exhibit list. Second, she argues that the prejudicial effect outweighed the probative value of the conviction.
As to her first argument, Mrs. Billings argues DOTD should not have been allowed to introduce her husband’s misdemeanor conviction under Local Rule 18, Section B of the Fifteenth Judicial District Court. Section B provides an outline of the information which the parties must provide to the court prior to trial. Specifically, Mrs. Billings points to the following language of Section B:
(c) EXCHANGE OF SPECIFIC WITNESS (LAY AND EXPERT) AND EXHIBIT LISTS ...
(iii) Each party shall list separately and with particularity each exhibit.
(iv) Should a party fail to introduce its listed exhibit, an opposing attorney may introduce the exhibit.
(v) Absent good cause, no witness or exhibits shall be allowed which are not properly identified and listed.
Ms. Billings also supports her argument by quoting Wells v. Gillette, 620 So.2d 301, 305 (La.App. 4 Cir.), writ denied, 629 So.2d 396 (La.1993), which states:
An orderly disposition of each case and the docket and avoidance of surprise are inherent in the theory of pretrial procedure. Ernes v. McKnight, 262 La. 915, 265 So.2d 220 (1972); Naylor v. La. Dept, of Public Hwys., 423 So.2d 674 |4(La.App. 1st Cir.1982), writs denied, 427 So.2d 439 (La.1983) and 429 So.2d 127, 134 (La.1983). A trial court has much discretion in determining whether or not to modify a pre-trial order. Neff *1137 v. Rose, 546 So.2d 480 (La.App. 4th Cir.1989), writ denied, 551 So.2d 1322 (La.1989); Naylor, supra; Sibley v. Menard, 398 So.2d 590 (La.App. 1st Cir.1980), writ denied, 400 So.2d 211 (La.1981). The discretion of the trial court to modify the pre-trial order must be exercised to prevent substantial injustice to parties who have relied on the order and structured their cases accordingly. Creppel v. Louisiana Power & Light Co., 514 So.2d 239 (La.App. 5th Cir. 1987), writ denied, 516 So.2d 131 (La.1987).
Mrs. Billings asserts that the introduction of her husband’s conviction for possession of marijuana surprised her and undermined the presentation of her case. We disagree, and we find that the trial judge’s decision to modify the pretrial order in this instance was well within its discretion. Accordingly, we find this argument without merit.
Next, Mrs. Billings argues that the trial judge erred in allowing the introduction of the misdemeanor conviction to impeach Mrs. Billings’ economic evaluation because the prejudicial value was great and the probative value was insignificant. In support of her argument, Mrs. Billings points to the testimony of Ricky Barake, Mr. Billings’ employer. Mr. Barake testified it was not company policy to take into account whether a potential employee had a criminal history or had problems with alcohol or drugs. In addition, Mr. Barake stated that such history would not necessarily make a difference in hiring a person.
The trial judge’s assessment of the probative value of evidence carries great weight, such that in the absence of a clear abuse of discretion in assessing the probative value of evidence, the ruling of the trial judge will not be reversed on appeal. Green v. Claiborne Elec. Coop., Inc., 28,-408 (La.App. 2 Cir. 6/26/96); 677 So.2d 635. Here, the trial judge found Mr. Billings recent conviction probative to conducting an economic evaluation. After a review of the record, we conclude that the trial judge did not abuse his discretion in allowing the jury to consider evidence of Mr. Billings’ conviction for possession of marijuana when considering his economic status. Accordingly, we find this assignment of error without merit.
EXPERT WITNESSES
Mrs. Billings asserts three errors regarding the trial judge’s treatment of expert witness testimony during the trial. First, Mrs. Billings asserts that the trial judge erred in excluding the expert testimony and video of Jeff Galpin as being unsupported by a scientific foundation. Second, she asserts that the trial judge erred by refusing to allow Mrs. Billings to examine Dr. Joseph Blaschke as to the expert’s bias. Finally, she argues that the trial judge erred in allowing Dr. Blaschke to testify as to the effects of modified guardrails on the Billings’ car.
Mrs. Billings argues that the trial judge improperly excluded the expert testimony and video of Jeff Galpin. Mr. Galpin is a Screen Actors Guild member and a stuntman, who has performed approximately ten jumps off of ramps. He provided a videotape, which showed his jump from a pipe ramp on a highway in New Orleans during the filming of a movie. Mrs. Billings asserts that Mr. Galpin’s testimony would have been based on “specialized knowledge available to few as to how the dynamics of the vehicle occurred during the entry onto a ramped surface.”
La.Code Evid. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may *1138 testify thereto in the Rform of an opinion or otherwise.
The trial judge has great discretion in determining whether to allow a witness to testify as an expert. Darbonne v. Wal-Mart Stores, Inc., 00-551 (La.App. 3 Cir. 11/14/00); 774 So.2d 1022. We will not disturb a trial judge’s determination regarding whether to allow expert witness testimony unless his decision is clearly erroneous. Id. The trial judge must serve as gatekeeper by determining whether possible expert testimony is reliable and relevant. Id. This “gatekeeping” function applies not only to “scientific” testimony but to all testimony based on specialized knowledge. Id. at 1027.
The trial judge denied qualifying Mr. Galpin as an expert because he concluded that Mr. Galpin’s testimony would not be based on scientific evidence. After a review of the record, we find that the trial judge did not err in excluding Mr. Galpin’s testimony and videotape. Apart from the trial judge’s finding that the testimony would not be based on scientific evidence, we find that the proposed expert testimony would have had little, if any, relevance to the instant case. Accordingly, we find this assignment of error without merit.
In her next assignment of error, Mrs. Billings asserts that the trial judge erred by refusing to allow her to examine DOTD’s expert, Joseph D. Blaschke, as to the expert’s bias. At trial, Dr. Blaschke testified on behalf of DOTD as an expert in accident reconstruction, traffic engineering, and in the effects of alcohol and drugs on behavior. Mrs. Billings asserts that she should have been allowed to question Dr. Blaschke regarding the rejection of his testimony as “biased and unreliable” in several cases prior to the institution of this case.
|7At trial, Mrs. Billings sought to challenge Dr. Blaschke’s qualification as an expert in the fields of accident reconstruction and traffic engineering based on his bias toward the DOTD. As a result, a considerable dialogue took place prior to Dr. Blaschke being called to the stand. The following is a portion of that dialogue:
MR. GOFORTH: I want to ask has your opinion been rejected because of bias and I would like the Court to rule on it because I don’t want to go over—
[[Image here]]
MR. GOFORTH: I think it goes to his qualifications and also the bias aspects of it.
MR. CAMPBELL: I think it’s trying to create a bias, your Honor.
[[Image here]]
THE COURT: It’s talking about other cases that are not pertinent here.
MR. CAMPBELL: And the unfairness of this is the surprise because if we were going to have Daubert expert hearings, believe me, I could bring a trunk full of stuff in here to criticize Mr. Dwayne Evans on and I’m surprised in the middle of a trial with this and it’s just not proper.
THE COURT: You can ask him questions to prove bias if you wish to, but as far as asking him to — asking the witness to conclude if a Court has ever found him bias, I don’t think that would be fair.
MR. GOFORTH: Are you saying, no, don’t do that?
THE COURT: Don’t do it that way.
As a general rule, extrinsic evidence is admissible to show a witness’s bias and to attack his credibility. La. Code Evid. art. 607(D)(1). However, a court may exclude such evidence if it determines “that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue eonsumption |sof time, confusion of the issues, or *1139 unfair’ prejudice.” La.Code Evid. art. 607(D)(2). Although this is a close call, we find that the trial judge did not err in failing to permit Mrs. Billings to question Dr. Blaschke regarding the particulars of other cases in which other courts had determined that his testimony was biased. In making our determination, we note that, although the trial judge denied Mrs. Billings that particular avenue of questioning, he specifically indicated that Mrs. Billings could question Dr. Blaschke regarding his possible bias toward DOTD. Mrs. Billings preserved her objection to his qualification as an expert based on his bias toward DOTD; however, when presented with the opportunity to question him, she failed to question him about possible bias. Based on our review of the record, especially the qualification of Dr. Blaschke, we do not find that the trial judge erred in this instance. Accordingly, we find this assignment of error without merit.
Mrs. Billings also asserts that the trial judge erred in allowing Dr. Blaschke to testify as to the effects of modified guardrails on the Billings’ car. Specifically, Mrs. Billings points us to a portion of the trial transcript in which Dr. Blaschke “refuses to tell how he would design a guardrail at the same location, using late 1970’s AASHTO standards.” The dialogue at trial was as follows:
Q So I take it what you’re saying here is that given the body of knowledge that you felt would have been available in 1979, you would have done this exactly the same way; is that correct?
A It would have been one of the types of designs that I could have used. I can’t tell you what I would have used because I wasn’t there, but it was a permitted terminal that could be used.
Q My question was: Given the body of knowledge that you felt was available in 1979, you would have done this the Usame; is that right?
A And I’m telling you that I can’t answer that because I don’t have all the factors that went into the decision making process, but that terminal would have been available for my use if I would have chosen it. How can I answer that question any different? I don’t have any way of knowing how to design something unless I’m ■ able to look at all the parameters available.
Based on this dialog, Mrs. Billings would have us find that Dr. Blaschke did not have the expertise to form any of the opinions he expressed at trial.
We begin our analysis by noting that the trial judge accepted Dr. Blaschke as an expert in the field of accident reconstruction and traffic engineering, as well as an expert in the effects of alcohol and drugs on behavior. At trial, Dr. Blaschke testified that he holds three advanced degrees from Texas A & M: a Master of Science Degree in civil engineering, a Master of Engineering Degree specializing in traffic engineering, and a Doctor of Engineering Degree. In addition to his education, Dr. Blaschke testified that he spent four years in the Army, during which he spent two years serving as a transportation engineer for the Armed Forces. As a transportation engineer, he conducted traffic engineering safety studies on military installations. Furthermore, Dr. Blaschke testified that he served as a traffic engineer for the City of Houston from 1977 to 1979. Dr. Blaschke testified that from 1979-1985 he served as a consultant, doing consultant work in highway design, traffic engineering, and accident reconstruction. Additionally, Dr. Blaschke testified that he worked for the Texas Transportation Institute from 1985 to 1991. He also testified that he taught *1140 in the civil engineering department at Texas A & M University from 1987 to 1993. Finally, Dr. Blaschke testified that for approximately the last nine years he has owned |10a consulting practice. In that practice, Dr. Blaschke does consulting work in highway design, traffic engineering, and accident reconstruction.
In addition to his testimony showing his general qualifications as an expert, Dr. Blaschke testified regarding his knowledge of guardrail design at the time the guardrails at issue were designed and installed. Dr. Blaschke testified that among other things, he had reviewed the accident report by Trooper Hanks, the construction plans from 1964 which were used to construct the portion of Interstate 10 in question, and the safety improvement plans developed in 1978 which were used to incorporate safety improvements along the interstate. Dr. Blaschke also testified that he had seen the photographs of the accident scene and of the vehicle at the accident scene. Furthermore, he testified that he had seen the results of the blood alcohol test performed on Mr. Billings. Finally, Dr. Blaschke testified that he had reviewed various publications from the 1960s to the 1990s dealing with barrier design applications.
A trial judge has great discretion in determining the competency and qualifications of an expert witness. Young v. Armadores de Cabotaje, S.A., 617 So.2d 517(La.App. 4 Cir.1993), on remand, 90-1107 (La.App. 4 Cir. 11/17/94, 645 So.2d 1266), writ denied, 95-0113 (La.3/10/95); 650 So.2d 1185, cert. denied, 516 U.S. 819, 116 S.Ct. 76, 133 L.Ed.2d 36 (1995). We will not disturb a trial judge’s decision as to the competency and qualifications of an expert absent a finding that the trial judge was clearly wrong as matter of law. Id. After a review of the record, we find that the trial judge did not err in finding Dr. Blaschke competent to testify regarding the design of the guardrails at issue in the instant case. Accordingly, we find this assignment of error without merit.
InFAULT
Mrs. Billings’ final three assignments of error hinge on whether the jury erred in finding that the DOTD was not at fault in causing the death of Mr. Billings. We may not set aside a jury’s finding of fact in absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State, through DOTD, 617 So.2d 880 (La.1993). In applying the manifest error-elearly wrong standard, we must determine not whether the jury was right or wrong, but whether its conclusion as fact-finder was a reasonable one. Mart v. Hill, 505 So.2d 1120 (La.1987). We are compelled to review the record in its entirety to determine whether the jury’s finding was clearly wrong or manifestly erroneous. Id. We may not reverse if the jury’s findings are reasonable in light of the record when reviewed in its entirety, even if convinced that if we had been sitting as the trier of fact, we would have weighed the evidence differently. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990).
At trial and on appeal, Mrs. Billings asserts that DOTD was at fault for her husband’s death for its failure to follow the American Association of State Highway Transportation Officials (AASHTO) standards. Specifically, Mrs. Billings argument hinges on the standards contained Guide for Selecting, Locating, and Designing Traffic Barriers published in 1977 by AASHTO In her brief, she argues that these standards were mandatory. In support of her argument, she points to the following language:
APPENDIX A
| ^RECOMMENDED STANDARDS
*1141 This appendix contains the standards and essential details of the recommended guardrail and median barrier systems discussed in Chapter Three.
No alterations should be made in these standards. Full-scale tests indicates that minor structural changes can affect guardrail effectiveness.
A review of this guide shows that the AASHTO standards were only recommendations, not mandates. Rather than show that the standards were mandatory such that DOTD had to follow them, this appendix repeatedly indicates that these standards are recommendations. The guide’s stated purpose was “to summarize the current state of knowledge and to present specific design guidelines for highway traffic barriers. The guidelines establish the conditions which warrant barrier protection, the type of barriers available, and how the barrier should be installed dimensionally or geometrically.”
Furthermore, the guide provided for how it should be applied. Specifically, the guide stated:
I-C. Application of Guide
The contents of this document are intended as guidelines for those responsible for the design, installation, and maintenance of traffic barriers. It will have applications primarily to high speed facilities since the vast majority of studies to date have concerned such facilities ....
Due to the complex nature of the subject matter, many of the criteria contained in this guide are by necessity based on subjective data. In some areas, only general suggestions and recommendations can be made. It can therefore not be overemphasized that application of these guidelines must be made in conjunction with sound evaluation of the facts and engineering judgment to effect the proper solution.
Accordingly, Mrs. Billings argument that DOTD’s deviations from the AASHTO’s | ^standards constituted fault per se is without merit.
Additionally, DOTD presented ample testimony at trial showing that the guardrail installed near the La. Hwy 724 overpass was within acceptable design and installation standards. At trial, the jury heard the testimony of Dr. Blaschke regarding the design of the guardrail. Dr. Blaschke testified that the clear zone concept “didn’t come into being until after this highway was designed.[1]” Dr. Blaschke testified that the guardrail in place near the La. Hwy. 724 overpass was designed to prevent traffic from impacting the posts supporting the overpass. He testified that the guardrail initially in place near the La. Hwy. 724 overpass had been designed to eliminate two of the problems with guardrails built prior to 1964. In the earlier designs, the end points of the guardrails did not have any special treatment. Accordingly, vehicles that struck the end point came to a “relatively quick stop and that resulted in many serious injuries.” “Even worse,” Dr. Blaschke testified, “in many cases the guardrail actually would come into the vehicle.” Dr. Blaschke testified that this would cause “tremendous injury” and “tremendous havoc within the vehicle.”
The guardrail in question was designed with a turned down end treatment. “It was brought down into the ground and then anchored such that a vehicle that struck it would essentially be redirected in some manner and the end would not stop the vehicle and the end would not penetrate the vehicle.” Although this design *1142 alleviated the problems present in the older end treatment design, a new problem arose when using the turned down end treatment. Dr. Blaschke testified that when a vehicle would strike the guardrail at a certain angle, it would lift the vehicle up and function |ulike a ramp. At that time, he testified that the new design was considered a legitimate trade off to the older design because it corrected two problems while it created one that had not existed before. In 1978, a plan was made to make safety improvements to Interstate 10. The 1978 plan called for a new guardrail design which involved the removal of the intermediate posts and the stiffening of the barrier near the columns. This alteration had two purposes; to make an improvement in the end treatment and to prevent the vehicle from bending as much as it would if it struck one of the columns. According to Dr. Blaschke’s testimony, in 1979, the existing guardrails were either modified or new guard rails were installed, replacing those initially installed when the interstate was constructed. The guardrail Mr. Billings struck was one modified or replaced by the 1979 safety project.
After giving a detailed discussion of the evolution of guardrail design, Dr. Blaschke testified that each guardrail design had its tradeoffs, being better for some types of collisions than others. Of the designs available in 1979, Mrs. Billings’ expert, Hossein Ghara, favored the design made to “collapse, basically, fall down and allow the vehicle to go over it.[2]” Dr. Blaschke testified however, that while this design would have alleviated some of the problems in the earlier models, the design had other problems. Specifically, once a vehicle struck the guardrail, the vehicle could leave the roadway and go behind the barrier. What happened next depended on the speed and actions of the driver.
Finally, Dr. Blaschke testified regarding the likely outcome of the accident had the collapsing guardrail design had been in place. Dr. Blaschke testified that | ^although he could not say for certain what would have happened had another design been used, he felt the accident would have been similar. Specifically, he testified:
Well, you’ve still got the same problems. If the 'vehicle gets on top of this rail, it’s still going to be guided past the drops— the posts that drop — and you’re right back to that rigid post again. So that’s why even the break away type post design would work better if the vehicle struck it somewhat from at a side and angle, but if you go parallel it ... just extends a little bit longer time before he’s ramped up again.... He probably would have ended up similar to where he was or if it does collapse, it’s very likely he would have been behind the barrier and at that point there’s no telling what he strikes because he’s still heading toward the columns, the back of the barrier and at that location there is a concrete structure, which we call a rip rack which slopes down from the overpass underneath the overpass and it slopes down toward the ground and it’s typically concrete. And he was heading right for that direction and he’s behind the barrier so he’s still going to hit something.
Q ... [B]ut if in the 1979 safety project they had installed the five (5) weakened posts fall down system and kept the turndown end treatments, it would have been up to the driver of this vehicle ... to stop it or else he would have knocked all the posts down and encountered a rigid post and mounted the barrier? *1143 A Well, that’s probably what would have happened if his vehicle does ... And so if we extend the barrier out another twenty-five (25) or thirty (30) feet and provide weakened posts, then, basically we end up with the same accident except he has a little bit longer to travel along the railing until he gets to the fixed post.
(Emphasis added.)
Additionally, parts of Mr. Ghara’s testimony buttressed Dr. Blaschke’s testimony. Mr. Ghara testified that a turned down end treatment “can be a crashworthy end treatment, but on occasions depending on the severity, the speed, the angle of impact, other parameters, it could malfunction. It may not perform as intended.” Mr. Ghara also testified that, “until just very recently, end treatments h ¿where end treatments have become more sophisticated in their design, there has been a number of instances where all of these end treatments have failed on some occasions.” Further, he stated, “[b]ut as we know more about turndowns, BCTs, and melts, all of them have had their short falls. None of them were a perfect solution for all impacts, particularly as the fleet of automobiles has changed in recent years and more and more people are using SUVs, trucks.”
As is evidenced by its finding of no fault on the part of DOTD, the jury obviously found Dr. Blaschke’s testimony credible and gave it more weight in making its determination, than the experts presented by Mrs. Billings. Where the testimony of expert witnesses differs, the jury as fact finder must determine which expert’s testimony is more credible. See Agricultural Equip. Co., Inc. v. Rozas, 488 So.2d 241(La.App. 3 Cir.1986). We will not overturn a jury’s finding of fact as to which expert witness is more credible unless manifest error appears in the record. After reviewing the record, we find that the jury was not manifestly erroneous in failing to apportion the DOTD fault with regard to Mr. Billing’s fatal accident. Accordingly, we find this assignment of error without merit. Therefore, we do not find it necessary to review the jury’s failure to award damages.

DECREE

Based on the foregoing discussion, we affirm the decision of the trial judge in all respects. All costs of appeal are assessed against Mrs. Billings.
AFFIRMED.

. The clear zone concept, according to Dr. Blaschke’s testimony, is the idea that the area near the roadway should be clear so that if a vehicle leaves the road, the driver does not become affected by objects close at hand and has an opportunity to recover.

. This design involved the use of five "fall down post” in the guardrail and a "turndown end.” The design idea was published in 1971.