STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-634

RICKEY CLARK

VERSUS

LOUISIANA MEDICAL MUTUAL INS. CO., ET AL.

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. C-2006-1115
HONORABLE HERMAN I. STEWART, JR., DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and
Marc T. Amy, Judges.

AFFIRMED.

John E. Bergstedt
The Bergstedt Law Firm
P. O. Box 1884
Lake Charles, LA 70602
Telephone: (337) 436-4600
COUNSEL FOR:
    Defendants/Appellees - Louisiana Medical Mutual Ins. Co. and Dan
    Butler, M.D.

Joseph Anthony Delafield
P. O. Box 4272
Lake Charles, LA 70606-4272
Telephone: (337) 477-4655
COUNSEL FOR:
    Intervenor Appellee - Texas Property & Casualty Insurance
    Guaranty Assoc.

**R. Scott Iles**
**P. O. Box 3385**
**Lafayette, LA 70502**
**Telephone: (337) 234-8800**
**COUNSEL FOR:**
**Plaintiff/Appellant - Rickey Clark**

**THIBODEAUX, Chief Judge.**

This case involves a medical malpractice suit brought by the plaintiff-appellant, Rickey Clark, Sr., against the defendants-appellees, Dr. Dan Butler and his malpractice carrier, Louisiana Medical Mutual Insurance Company (Medical Mutual). The jury found that Dr. Butler had not breached the applicable standard of care in his treatment of Mr. Clark and entered a verdict to that effect. Mr. Clark's motion for a judgment notwithstanding the verdict and for a new trial was denied. Mr. Clark filed this appeal. We affirm the judgment of the trial court.

## I.

## ISSUES

We must decide:

(1)    whether the trial court erred under La.C.E. art. 609 in admitting evidence of the plaintiff's guilty plea to aggravated incest in 2000; and

(2)    whether the trial court manifestly erred in denying the plaintiff's requests for a judgment notwithstanding the verdict and a new trial.

## II.

## FACTS AND PROCEDURAL HISTORY

Rickey Clark, Sr. sustained a work-related injury in Texas in June 2004 when he slipped off of a cross tie being used as a catwalk a couple of feet above the ground. He twisted and injured his right foot, ankle, and heel. The radiology report on the date of the injury demonstrated a comminuted fracture of the calcaneus, or heel. The fracture line extended into the subtalar joint, which is the joint beneath the ankle joint.

Mr. Clark began seeing Dr. Dan Butler, an orthopedist in DeRidder, Louisiana, a week after the injury. He arrived on crutches and in a cast boot with

complaints of throbbing pain in the right heel, not relieved by the Lortab that he was taking for pain. Upon examination, Dr. Clark noted bruising on the heel and through the mid-foot area. He warned Mr. Clark not to bear weight until further treatment. Dr. Butler diagnosed a calcaneal fracture of the right foot and ordered a CT scan. The June 2004 CT scan identified a severely comminuted fracture of the calcaneus and a chip fracture arising from the posterior aspect of the talus. Dr. Butler planned to perform surgery on the heel. However, when it was determined that Dr. Butler was not on the physician list of the workers' compensation carrier, Mr. Clark was transferred from Dr. Butler to Dr. Dale Bernauer, an orthopedist in Lake Charles.

Dr. Bernauer first saw Mr. Clark in July 2004, three weeks after the injury. His history stated that the patient slipped off a catwalk and caught his weight on his right ankle and was painful at the heel. His x-rays showed a fractured calcaneus with mild flattening. The fracture had started to heal. Dr. Bernauer opined that Mr. Clark's condition would have to be accepted like it was, and that Mr. Clark might develop arthritic changes after the healing. Dr. Bernauer treated Mr. Clark conservatively for six months. During that time, he ordered an MRI. The MRI report referenced a history of right ankle pain medially and laterally. In addition to the heel fracture, the MRI report described bone bruising, and a small tibiotalar (ankle joint) subtalar effusion. By December 2004, Dr. Bernauer noted no improvement and explained to Mr. Clark that he might benefit from a subtalar fusion. He referred him to pain management for evaluation and possible treatment.

Unhappy with Dr. Bernauer's conservative treatment, Mr. Clark requested a change of treating physician, asking to return to Dr. Butler who was now on the workers' compensation physician list. Mr. Clark stated in the request that Dr.

Butler would do the proper surgery to his ankle and heel that would enable him to return to work.

Dr. Butler began seeing Mr. Clark again in late December 2004. He noted the MRI results and current x-rays of the heel showing that it had shortened and had lost the Boehler's angle. He reported that Mr. Clark continued to complain of pain with weight bearing and that at some point he would need a subtalar fusion. Dr. Butler's impression was malunion of the right calcaneus, tobacco abuse, and osteoarthritis of the MP joint of the right great toe, due to a crush injury in the 1980s. He ordered a bone scan in January 2005. The report stated that there was a rather pronounced increased uptake of radiographic material at the right ankle and described the condition as chronic and degenerative and related to repetitive stress. The impression was that the abnormalities were most severe at the right ankle.

By February 2005, Mr. Clark was taking MS Contin, which is morphine, and asking for something stronger. He complained of throbbing pain. Dr. Butler's report indicates that his impression was severe osteoarthritis of the right ankle and heel and that his plan was to perform a total ankle fusion. Mr. Clark was admitted to Beauregard Memorial Hospital, and Dr. Butler performed a two-joint subtalar and tibiotalar fusion on February 24, 2005. Following surgery, Mr. Clark continued to complain of pain, calling Dr. Butler regularly for pain medication, and going several times to the emergency room of Beauregard Memorial Hospital for pain shots and pain medication. On two separate office visits in March 2005, Dr. Butler reported drug addiction and Lortab addiction, which he thought was the reason that Mr. Clark was not getting relief from pain. Again, on two separate visits in June 2005, Dr. Butler notes drug-seeking behavior.

3

Dr. Butler noted that Mr. Clark had continuing complaints of pain, even though he was not getting out of bed and putting weight on the foot. He expressed his concerns over the fact that Mr. Clark was not walking, which would not help the fusion to occur. Additionally, Mr. Clark did not clean his wound with the antibacterial solution recommended but used Epsom salts instead. Dr. Butler also had concerns regarding Mr. Clark's continued smoking in spite of having been told early on that his smoking would interfere with the fusion. In mid-April 2005, when Mr. Clark went to the emergency room for pain medication, blood work was taken and he was told that he had an infection. When he saw Dr. Butler a couple of days later, Dr. Butler noted no signs of infection. By the next visit, Dr. Butler had received the results of the blood work done at the emergency room which reflected an elevated white blood cell count indicating infection. Dr. Butler subsequently scheduled Mr. Clark for admission to the hospital and removed the fusion hardware.

Mr. Clark left the care of Dr. Butler in June 2005 and began treatment with Dr. Clark Gunderson. Dr. Gunderson tried to control the staff infection and attempted, unsuccessfully, to revise the ankle fusion performed by Dr. Butler. Ultimately, in June 2007, Dr. Gunderson performed a below the knee amputation of Mr. Clark's lower right leg and foot. Mr. Clark was fitted with a prosthesis and was reportedly doing well. However, he still complained at trial of phantom pain, and his pain management physician indicated that he would likely need pain medication on an ongoing basis.

III.

## LAW AND DISCUSSION

An appellate court should not disturb reasonable evaluations of credibility and reasonable inferences of fact made by a jury when the record as a

4

whole reveals a reasonable basis for the finding in the trial court. *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1978). An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106 (La.1990).

Mr. Clark asserts that Dr. Butler, whom he specifically sought out to perform surgery on his ankle and foot, committed malpractice in his care and treatment of the plaintiff, before, during, and after the ankle fusion surgery in 2005. Mr. Clark's position is that he never complained of ankle pain to Dr. Butler, that Dr. Butler never physically examined his ankle, that the doctor only made one follow-up call to Mr. Clark's residence, and that he ignored evidence that Mr. Clark had a post-operative infection that ultimately led to the below-knee amputation. Mr. Clark presented evidence of this alleged negligence via his wife's supporting testimony. He attempted to prove a negative by pointing to the absence of language in Dr. Butler's charts, which did not specifically state that he had manipulated, touched, twisted or otherwise physically examined the plaintiff's leg and ankle.

The jury heard live testimony and trial deposition testimony of many medical experts and specifically asked, during deliberations, for the medical records of the three treating physicians, Dr. Butler, Dr. Bernauer, and Dr. Gunderson. The jurors also asked for the medical review panel opinion of the three orthopaedic surgeons who testified that there was no breach of the standard of care. The records reveal that, while Dr. Butler was somewhat cryptic in his charting dictation, he did occasionally preface his notes with "upon examination." We also note that, by

5

comparison, Dr. Bernauer's charts are at least as cryptic as Dr. Butler's and likewise do not contain evidence of hands-on manipulations, except that he prefaced his reports with the sentence "I examined this 40-year-old white male on [current date]." Dr. Bernauer then reported, just as Dr. Butler had done, the patient's complaints on that date. In fact, Dr. Butler's charts contain significantly more details in the history/physical sections of the charts than those of Dr. Bernauer. Contrary to the plaintiff's assertions that Dr. Butler never testified that he physically examined Mr. Clark, the record reveals that Dr. Butler clearly testified that he did.

Further contrary to the plaintiff's assertions, Dr. Butler's charts are replete with notes and message slips documenting numerous phone calls between his office and the plaintiff or his wife. Not only did Dr. Butler write and call in pharmacy prescriptions several times a month at Mr. Clark's request, his office also placed various follow-up calls to Mr. Clark after his surgery. Further, the record contains evidence that Rickey Clark complained of whole leg pain and ankle pain. Dr. Butler's charts contain several workers' compensation forms with Rickey Clark's handwritten complaints of ankle pain, particularly the full page handwritten request of Rickey Clark asking to change from Dr. Bernauer back to Dr. Butler because he believed that Dr. Butler would perform the surgery that he needed on his ankle. Ankle pain or injury is referenced on many of the reports of the diagnostic images. Rickey Clark told Dr. Bernauer on the first visit to him that he had caught his weight on his ankle when he fell. This report became a part of Dr. Butler's records as well.

Ultimately, the malpractice issue in this case turned on the type of surgery that Dr. Butler performed on Mr. Clark. Unable to perform the fixation of the heel that he intended to do right after the injury in June 2004, Dr. Butler was faced with doing a fusion eight months later. He chose to do a tibiotalar and subtalar

fusion, fusing the ankle joint and the joint beneath it. Mr. Clark asserts that it was malpractice to include the tibiotalar joint (ankle joint) in the fusion because there was nothing wrong with the ankle.

When negligence is alleged against a medical specialist, only those qualified in that specialty may offer expert testimony and evidence of the applicable standard of care. *Fox v. Our Lady of Lourdes Regional Medical Center*, 550 So.2d 379 (La.App. 3 Cir. 1989), *writs denied*, 556 So.2d 1263 and 556 So.2d 1264 (La. 1990). There was conflicting expert testimony among the orthopaedic surgeons who testified in this case regarding the reasonableness of fusing both joints. The three orthopedic surgeons who served on the medical review panel, Dr. Christopher Hebert, Dr. Stephen Nason, and Dr. Barry Henry, stated in their formal opinion that the choice of procedure was the basic issue in the case. The panel relied upon symptoms, original films, x-rays, bone scan, and MRI. Their opinion stated that the bone scan showed an increased uptake in the ankle, and the MRI showed posterior medial tibio talar arthrosis (ankle degeneration) which justified the procedure performed by Dr. Butler. The panel members found that the procedure performed met the applicable standard of care, as did the subsequent procedures. They characterized the injury as a severe extremity injury that unfortunately resulted in a salvage procedure.

Dr. Dale Bernauer, the orthopaedist who treated Mr. Clark conservatively between July and December 2004, testified that there was no justification for the ankle fusion. When asked by the plaintiff's counsel whether it was outside the standard of care for Dr. Butler to do an ankle fusion based upon the patient's continued pain in the lower extremity, Dr. Bernauer stated, "I wasn't there. I don't know what Dr. Butler saw. But, just based on what I see, I don't think that there's an indication to do an ankle fusion just because of pain." Then Dr. Bernauer

was shown Dr. Butler's bone scan for the first time, along with the post-op films. He responded only to the description of the surgery itself and opined only that he saw no justification for fusing the ankle.

Dr. Clark Gunderson is the orthopaedic surgeon who treated Mr. Clark for post-operative infection beginning in June 2005. Dr. Gunderson attempted unsuccessfully to revise the fusion and subsequently performed the amputation of Mr. Clark's lower right leg in June of 2007. When given x-rays to review at his trial deposition, he testified that, in looking at Dr. Bernauer's x-rays from 2004, and one x-ray he was given from Dr. Butler's records, that Mr. Clark did not have severe arthritis of the right ankle. Dr. Gunderson said that he agreed with Dr. Bernauer's opinion that there was no case for the ankle fusion. Gunderson stated that he, and "most people would operate on the joints where they thought the pain was coming from which would be the subtalar joint," the joint below the ankle joint.

On cross-examination, Dr. Gunderson testified that the calcaneus fracture is a very difficult injury to treat. He further testified that he was not indicating to the jury that a post-operative infection that started two to three months after surgery was in and of itself a breach of the standard of care. He stated that postoperative infections are complications of any surgery. Dr. Gunderson further admitted that he had not seen the MRI or the bone scan, the two diagnostic films that the medical review panel described in their opinion; nor had he seen the medical review panel opinion. On redirect by plaintiff's counsel, Dr. Gunderson was shown the MRI and bone scan for the first time, and he stated that he would not fuse the ankle just based upon the bone scan.

Dr. David DeLapp, the orthopaedist hired by the workers' compensation carrier to perform an independent medical examination of Mr. Clark first testified that

8

after treating a fracture nonoperatively, "It is very common from there to get traumatic arthritis so severe that you end up doing a fusion which is what subsequently Dr. Bernauer [Butler] had done. So . . . up through that point, everything seemed to be . . . within the acceptable standards of care." Dr. DeLapp was initially under the impression that Dr. Bernauer had done the ankle fusion. He later testified that on the radiographic findings he saw very little evidence, if any, to support an ankle fusion, particularly on the MRI, which he said showed minimal disease of the ankle joint. He further testified that the hardware used by Dr. Butler to do the subtalar and tibiotalar joint fusion represented "a perfectly acceptable way to do those fusions" and also opined that Dr. Butler's treatment of the infection, by administering antibiotics and removing the hardware, was appropriate.

Dr. Mark Perlman, a California orthopedic surgeon testifying on behalf of the plaintiff, stated that, based upon the films that he was given, he did not see the logic for the ankle fusion. He reviewed the x-ray taken in Texas on the day of the accident and identified the heel fracture with extension into the subtalar but thought the ankle looked near normal to him at that time except for a small spur that might be projectional. He looked at the MRI and identified a significant amount of bony edema with the calcaneus but thought the ankle was well preserved. However, he did testify that one of the big problems with fusion of the subtalar joint is that over time there is more stress placed on the ankle, and ankle arthritis can develop. He stated that one of the reasons the surgeon tries to align things perfectly is to stave off the development of ankle arthritis. He then stated that the morbidity of the fusion of the tibiotalar and subtalar joint is much greater than the morbidity of the subtalar fusion.

On cross examination, Dr. Perlman stated that the instrumentation used in the tibiotalar subtalar fusion was not an unreasonable choice. He further indicated

that infection is the first risk he discusses with a patient contemplating surgery. As to the postoperative care provided by Dr. Butler, he stated that it was not the most aggressive postoperative care of an infection that he had ever seen, but it was not below the standard of care and was within the realm of what is reasonable. He further indicated that the patient's personal hygiene and wound care can certainly be factors in the risk of infection, and that smoking escalates the risk of non-union of a fusion and can lead to wound healing problems which can lead to infection.

Dr. Perlman had not previously seen the CT scan or the bone scan, nor the medical review panel opinion prior to his trial deposition. In reviewing the CT and bone scan reports for the first time, he indicated that neither was specific enough without the actual films to review. However, the bone scan report described a total body scan indicating a hot spot at the bottom of the foot and ankle. He stated that if the camera was good, and the films were of good resolution, and if the report accurately portrayed what was seen on the bone scan, then it did provide a reason to re-examine the patient and do further work-ups; then if the bone scan were integrated into all of the other information, and the surgeon "truly ruled in the ankle joint as a cause of pain," then there would be justification for a two-joint fusion.

The medical review panelist, orthopaedic surgeon Dr. Barry Henry, testified that the bone scan was, in his mind, the most significant reason for Dr. Butler's choice of the two-joint surgery. Dr. Henry stated that when he looked at the bone scan film he saw that there was a hot area showing more activity in the bone above the calcaneal fracture and even above the subtalar joint. He indicated that an orthopedist looks at the whole picture in front of him. He described Mr. Clark as a patient who was almost eight months post-injury with trouble managing his pain and trouble ambulating, and even though the x-rays did not show much arthritis, the bone

scan showed activity. He said that Dr. Butler would have considered all of this along with the MRI and other diagnostic studies, the patient's complaints, the doctor's examinations, the fact that there was a drop, and an impact on the foot that was transmitted throughout the leg.

When cross-examined by the plaintiff's counsel about Dr. Butler's reference to severe osteoarthritis of the ankle, Dr. Henry stated that he would not agree with that statement. However, he explained that it was a clinical statement by the treating physician, not a radiologist, and that orthopedic surgeons look at radiographs as part of the treatment of the patient's clinical scenario. When argumentatively pressed by plaintiff's counsel to compare Dr. Bernauer's conservative treatment to Dr. Butler's decision to perform surgery, Dr. Henry pointed out that the two physicians did not treat Mr. Clark at the same time. Dr. Henry further pointed out that Mr. Clark came back to Dr. Butler, after the conservative treatment of Dr. Bernauer, because he was in a lot of pain and was seeking care from the physician who had previously offered him surgery. He also pointed out that the third party administrator for the workers' compensation carrier approved the surgery by Dr. Butler. That approval is a part of Dr. Butler's records and was reviewed by the jury during deliberations.

Medical review panelist, orthopaedic surgeon, Dr. Stephen Nason, explained why the fracture sustained by Mr. Clark was so difficult to treat. He testified that the calcaneus, or heel, is a weight bearing bone that must bear the entire body's weight in walking, and the fracture often, as in this case, includes fractures that go into the joint surfaces that join with other bones in the foot and typically injure the joints themselves, resulting in painful joints and arthritis involving the joints, even in the face of successful healing of the fracture. Dr. Nason indicated that

there are different treatment modalities for such fractures and that conservative plans and more aggressive plans involving surgery can both be within the standard of care.

Dr. Nason explained the function and purpose of the bone scan ordered by Dr. Butler prior to Mr. Clark's surgery, explaining how the amount of injected radiographic material taken up by the bone reflects the processes going on in a bone or joint. The result is a localized picture of areas with significant problems. He testified that in Mr. Clark's case, the bone scan showed various aspects of take-up of the radioactive material in the areas that would be normal in the body, but also showed abnormal uptake, most severe in the right ankle joint. Dr. Nason and the other panel members studied the original bone scan films and formed the unanimous opinion that the bone scan, along with the MRI showing ankle degeneration, the other evidence, including x-rays and symptoms, justified the procedure performed by Dr. Butler.

When examined by the plaintiff's attorney, Dr. Nason agreed that particular x-rays shown to him at that time did not indicate severe osteoarthritis, but stated that the MRI and other films depicted a condition of the ankle joint for which the two-joint fusion was one possible option. When asked why a total ankle fusion was a possible option, Dr. Nason stated, as Dr. Perlman had, that fusing the subtalar joint alone would produce additional stresses and forces on the ankle joint itself, causing expected progressive deterioration of the ankle joint. Therefore, a decision to fuse the ankle joint along with the subtalar joint is a practical option.

Medical review panelist, orthopedic surgeon Dr. Christopher Hebert, testified that the information that would allow Dr. Butler to choose ankle fusion surgery for Mr. Clark would have been first and foremost the physical exam, his clinical evaluation on what the patient was presenting with, where he hurt, whether

there was deformity on exam leading him to believe that the ankle was in danger. Dr. Hebert stated that the MRI in particular showed an effusion, fluid at the tibiotalar joint; and the bone scan showed increased uptake at the subtalar joint and at the ankle joint. He stated that while the panel was at a disadvantage in not being able to see all that Dr. Butler saw, based upon the evidence, there was a problem at the ankle which made the subtalar and ankle fusion appropriate and within the standard of care. With regard to Mr. Clark's delayed post-operative staff infection, Dr. Hebert stated that infection is probably the most common orthopedic post-operative complication. The bacteria tend to migrate and live adjacent to the hardware, and in many cases, the only way to eradicate the infection is to remove the hardware, as Dr. Butler did.

Upon examination by the plaintiff's counsel regarding Dr. Butler's impression of severe osteoarthritis, Dr. Hebert testified that he does not treat the x-ray; he treats the patient. He stated that a physician draws in all of the information from the clinical examination, the MRI, the bone scan, the physical examination, and whether the patient exhibits deformity when standing. He then stated that the x-ray under discussion showed mild arthritis, but the appropriateness of the fusion comes from considering all of the information as a whole. Dr. Hebert then indicated that the x-ray did show a loss of height of the calcaneus, and with that there is dorsi flexion of the talus, which he had seen in many, many patients who have had malunions of the calcaneus resulting in ankle pain. Dr. Hebert indicated that these experiences helped him to put the fusion in perspective as a reasonable option and an option that falls within the standard of care.

A major issue created by the plaintiff's counsel throughout the testimony was his perceived failing of Dr. Butler to specifically state in his examination reports that the "throbbing pain" described by Mr. Clark was within the tibiotalar joint. As

13

indicated above, it is true that both Dr. Butler and Dr. Bernauer were somewhat cryptic in their reports of physical examinations of the plaintiff. When Dr. Christopher Hebert was questioned on this issue, he responded that he thought that most orthopedists like himself with busy practices do not dictate everything they observe and that Dr. Butler should not be condemned for not dictating everything. As an example, he stated that there was no dictation regarding deformity, but there was deformity indicated in the films showing loss of height in the calcaneus. Dr. Butler himself testified that he did not dictate every thing he saw or every question he asked, such as whether the patient had more problems ambulating on certain kinds of terrain.

Our jurisprudence holds that the law does not require perfection in medical diagnoses and treatment. Rather, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. When the experts' opinions contradict one another regarding compliance with the applicable standard of care, the trial court's conclusions must be granted great deference. It is the sole province of the fact finder to evaluate the credibility of the experts and their testimony. *Johnson v. Lake Charles Memorial Hosp.*, 96-1178 (La.App. 3 Cir. 3/5/97), 692 So.2d 514 (citations omitted).

In this case, where the expert witnesses gave conflicting opinions, and the parties gave conflicting testimony that made credibility a major issue in this case, the jury studied the evidence and returned a verdict stating that Dr. Butler had not breached the standard of care in his treatment of Mr. Clark. The plaintiff asserts that this happened only because the jury was inflamed by one question and answer regarding the name and date of a crime that Mr. Clark pled guilty to in 2000. Mr.

14

Clark contends that, in finding for the defendant, the jury ignored expert testimony of substandard care because the trial court erroneously admitted prejudicial evidence that Mr. Clark had previously been convicted of the crime of aggravated incest. We can find no merit in this assertion.

**Admissibility of Evidence of Criminal Convictions**

During Mr. Clark's testimony, the attorney for Dr. Butler asked him if he had ever pled guilty to or been convicted of a crime. Prior to Mr. Clark's answering, his attorney objected and asked for counsel to approach the bench. The trial court had the jury escorted out of the courtroom. Mr. Clark's attorney objected to the question on the grounds set forth in Louisiana Code of Evidence Article 609. The trial court asked for the article and read the main provisions into the record outside of the presence of the jury. That article provides in pertinent part as follows:

> Art. 609. Attacking credibility by evidence of conviction of crime in civil cases
>
> A. General civil rule. For the purpose of attacking the credibility of a witness in civil cases, no evidence of the details of the crime of which he was convicted is admissible. However, evidence of the name of the crime of which he was convicted and the date of conviction is admissible if the crime:
>
> (1) Was punishable by death or imprisonment in excess of six months under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party; or
>
> (2) Involved dishonesty or false statement, regardless of the punishment.
>
> B. Time limit. Evidence of a conviction under this Article is not admissible if a period of more than ten years has elapsed since the date of the conviction.
>
> . . . .

After reading Article 609, the trial court stated that he needed to know what the crime was in order to rule on its admissibility. Mr. Clark's attorney responded that it was "a drug charge" and that evidence of the crime was not admissible under the ten-year rule of Article 609(B). Mr. Clark then testified that he had served time for distribution of cocaine in 1992 or 1993. Accordingly, the drug charge was ruled inadmissible by the trial judge. However, Dr. Butler's attorney indicated that there was evidence of two other crimes, and he requested an instanter subpoena to obtain the disposition dates that he did not have. The trial court refused to delay the trial but signed the subpoena on the condition that the evidence be in his chambers by 1:30 that afternoon.

Shortly thereafter, court reconvened, still out of the presence of the jurors, and the trial court explained into the record that he had reviewed evidence in chambers of the crime of aggravated incest in 2000. He indicated that he would overrule the objection to admissibility. The trial judge further indicated that he had instructed the defense attorney as to the parameters of a single question that could be asked of Mr. Clark when the jurors were returned to the courtroom. Plaintiff's counsel further objected on the record to the admissibility of the crime of aggravated incest on the grounds that its probative value was outweighed by its prejudicial effect. Defense counsel then argued the probative value of the crime as two-fold.

Earlier in the trial, a witness for the plaintiff, Glen Hebert, a rehabilitation specialist, testified before the jury that Rickey Clark had "never had any problems with the law" and that he was a "pretty clean-cut individual," which was in direct contradiction to the record. Defense counsel further explained that credibility was a very important issue in this case based upon the testimony of Rickey Clark and his wife, Donna Clark, regarding their relationship with Dr. Butler. The Clarks'

accusations of malpractice included, among other things, their sworn testimony that Clark did not complain of ankle pain to Dr. Butler and that Dr. Butler never conducted an examination of Clark's ankle. Defense counsel argued that the criminal conviction was appropriate impeachment evidence on the issue of credibility.

In response to the arguments on the admissibility of the evidence of the felony,[1] the trial court stated that the conviction of Rickey Clark, which occurred on April 17, 2000, met the requirements of admissibility because it was within the last ten years and carried a sentence of over six months. With regard to the probative value versus the prejudicial effect, the trial court acknowledged that the evidence was of a prejudicial nature but stated that credibility was a critical issue in this case. He further indicated that defense counsel had correctly described the probative value as being twofold wherein a prior witness had testified as to Mr. Clark's clean record, and wherein the crime was one of "considerable moral turpitude" that could well weigh against credibility.

After further discussion, the trial judge asked that the jurors be returned to the courtroom. Defense counsel asked the plaintiff one question: "Mr. Clark, did you plead guilty to aggravated incest in Beauregard Parish on April 17, 2000?" Mr. Clark's response to the question was, "Yes." At that time, Mr. Clark's attorney rested

---

[1]La.R.S. 14:78.1. Aggravated incest:

A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.

. . . .

D. (1) A person convicted of aggravated incest shall be fined an amount not to exceed fifty thousand dollars, or imprisoned, with or without hard labor, for a term not less than five years nor more than twenty years, or both.

. . . .

17

his case.  Pursuant to evidence Article 609(A), no details were divulged to the jury, only the name and date of the crime.

The annotated cases interpreting La.Code Evid. art. 609 indicate that prior *felony convictions*, not misdemeanors, not arrests, but *convictions for felonies,* are usually admissible to attack a party's credibility if they are within the ten year rule and carry a sentence of over six months.  This is true because a conviction for a serious crime committed in the relatively recent past is relevant and probative on the issue of credibility.  More specifically, the COMMENTS to Article 609 provide in pertinent part as follows:

> (a) This Article is generally based on Federal Rule of Evidence 609 and thereby substantially modifies Louisiana law in civil cases.  It continues the practice of admitting evidence of convictions as well as the practice of excluding evidence of arrest, indictment, or prosecution, to attack the credibility of a witness.

> (b) Under prior Louisiana law evidence of a conviction of any crime was admissible on the issue of credibility regardless of the nature of the crime or when it occurred.   This Article changes that rule, limiting admissibility to crimes that *because of their seriousness or nature are particularly relevant to the issue of character for truthfulness.*   The one year limitation of the corresponding federal rule has been reduced to six months.  It should be observed that the balancing test of Article 609(A)(1) is phrased in terms slightly different from the balancing test of Article 403.  (Emphasis added)

Louisiana Code of Evidence Article 403 provides that, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

In *Williams v. United Fire and Cas. Co.*, 594 So.2d 455 (La.App. 1 Cir. 1991), evidence of an insured's conviction for attempted cocaine possession was admissible impeachment evidence where the insurer claimed that the insured had

18

materially misstated his theft losses with the intent to defraud and deceive the insurer. The trial court stated that recent felony convictions may be used to attack credibility, even if the conviction occurred since the incident in question, because the witness's current credibility, as well as his credibility at the time of the incident, are at issue. The court further articulated that Article 609(A) does not state that felony convictions used to attack credibility must involve false statements or dishonesty.

In *Breitenbach v. Stroud*, 06-0918 (La.App. 1 Cir. 2/9/07), 959 So.2d 926, testimony regarding a motorist's prior conviction for possession of a schedule II narcotic was found admissible for impeachment purposes in her personal injury action arising out of a motor vehicle accident. The question regarding the felony conviction was asked after the plaintiff testified that she did not do a lot of drugs; the felony was punishable by more than six months; and the court found that the probative value of the testimony was not substantially outweighed by the danger of any potential unfair prejudice toward the plaintiff. The court cited La.Code Evid. arts. 609 and 403.

In *Hughes v. Gulf Intern*, 593 So.2d 776 (La.App. 4 Cir.), *writ denied,* 595 So.2d 658 (La.1992), the appellate court determined that evidence of a defendant's prior prostitution convictions was not prejudicial in an assault and battery action brought against a movie theater and its employees. After finding evidence of older crimes inadmissible, the trial court permitted the plaintiff to impeach the theater employee with evidence of her prostitution convictions, which were approximately four years old.

Mr. Clark attempts to analogize the case of *Gage v. Potts*, 94-1542 (La.App. 1 Cir. 4/7/95), 653 So.2d 1183. There, evidence of the plaintiff's conviction in Texas in 1982 for aggravated sexual assault was found inadmissible, minimally

19

probative, and unfairly prejudicial, in his case against a motorist who rear-ended him and his pregnant wife. In that case, the conviction was over ten years old at the time of trial and was found inadmissible under the clear limits of Article 609(B). As the trial court explained, the ten year limitation in Article 609 (B) recognizes that convictions over ten years old generally have little probative value. Moreover, credibility was barely mentioned in *Gage v. Potts*; there was no discussion of competing expert testimony; and impeachment was not an issue. At trial, the defendants argued that the reference to the prior conviction was relevant to the plaintiff's claim for future wages. The appellate court reasoned that Mr. Gage's intervening work history was significant, and that any effect that his conviction had on his employability was slight.

Further distinguishing *Gage v. Potts* from the present case are the facts that the jury found the defendants liable for rear-ending the Gages but awarded zero damages to Mr. Gage and only $1,000.00 to Mrs. Gage. A finding of liability where there was evidence of causation and injuries, but no award of damages, would tend to support the appellate court's finding of unfair prejudice against Mr. Gage. We find no support for Mr. Clark's position in *Gage v. Potts*.

Mr. Clark asserts that the case of *Porter v. Namir*, 900 S.W.2d 376 (Tex. Civ.App. - Austin 5/3/95), provides the best perspective in weighing the probative value of a sex crime against its prejudicial effect. We disagree. Once again, Mr. Clark takes a court's language regarding the inflammatory effect of sexual crimes out of the context of the surrounding facts and circumstances of the case giving rise to the opinion. There, a patient and his wife sued an alcohol abuse counselor for the counselor's sexual assault of the patient's wife. Evidence of the counselor's prior conviction for sexual abuse of his step-son was excluded by the trial court as being

20

unfairly prejudicial. The plaintiffs contended that the sexual abuse evidence was relevant to the issues because both incidents involved sexual assaults of people who were in a position of trust with the defendant. Under Tex.R.Civ.Evid. 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, the appellate court concluded that the trial court could reasonably have determined that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

The appellate court in *Porter* contrasted the counselor's sex acts with the child, who was incapable of consent, and who was admittedly forced, to the sex act of adult masturbation with the patient's wife, a grown woman whose consent was hotly disputed at trial. She was described as a woman who invited the counselor to her home while her husband was out of town, and who did not believe that she had been sexually assaulted until her own counselor and therapy group convinced her of it at a later time. The appellate court affirmed the trial court's finding that the former incident was not significantly probative of the latter, but "the danger of unfair prejudice was particularly great because the extraneous conduct involved sexual abuse of a child." *Porter v. Namir*, 900 S.W.2d at 382. It is this language and the following language from the *Porter* case that Mr. Clark advances in support of his position:

> As the court noted in *Montgomery v. State,* 810 S.W.2d 372 (Tex.Crim.App.1990), an indecency with a child case: "Both sexually related misconduct and misconduct involving children are inherently inflammatory. . . . [T]here was a grave potential for decision on an improper basis, as jurors may have lost sight of specific issues they were called upon to decide and convicted appellant out of a revulsion against his parental demeanor." *Id.* at 397. The trial court did not abuse its discretion in determining that the danger of unfair prejudice substantially outweighed the probative value of the evidence.

21

*Porter,* 900 S.W.2d at 382.

While the court in *Porter* quoted language from *Montgomery,* a criminal case, the *Porter* court refused to apply the evidence standards of *Montgomery* to its civil cases because of the stringent standards the case developed for determining when evidence *must be excluded.* In general, the *Montgomery* test was a four-part test requiring that the probative value of the extraneous misconduct must be particularly compelling to avoid exclusion. The *Porter* court stated in its rationale that the *Montgomery* test made sense in a criminal case where the defendant risks loss of liberty if an extraneous offense is erroneously admitted. However, the *Porter* court opined that a similar danger did not exist in civil cases, and the court expressed its fear that such an application might require the exclusion of highly relevant evidence in many civil cases.

The *Porter* case does nothing to support Mr. Clark's contention because it is misapplied. The language relied upon is completely out of context where it derives from Texas criminal cases that use different criteria for determining probative and prejudicial values, even in Texas' own civil cases. The *Porter* case also involved the admissibility of a sexual crime that was far more morally blameworthy than the sexual allegations at issue in *Porter.* Hence, it could be said that, at least in *Porter*, the more similar the offenses, the more prejudicial the effect because the jury is more likely to focus on the similarity and fail to distinguish the lesser offense from the prior greater offense.

**Motion for Judgment Notwithstanding the Verdict and New Trial**

In this case, the trial court denied the plaintiff's motion for a judgment notwithstanding the jury's verdict (JNOV) and for a new trial. Mr. Clark asserts that the trial court erred in so doing. The authority for a JNOV is La.Code Civ.P. art.

22

1811, which provides also that it may be joined with a motion for a new trial or pled in the alternative. A JNOV is warranted only when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. However, if fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. *Davis v. Wal-Mart Stores, Inc.*, 00-0445 (La. 11/28/00), 774 So.2d 84.

Mr. Clark's motion for a new trial in this case is brought under La.Code Civ.P. art. 1972, with an assertion that the verdict and judgment appear contrary to the law and evidence. It is also brought under La.Code Civ.P. art. 1973 which provides the court with discretionary authority to grant a new trial in any case if there are good grounds for a new trial.

At the hearing on the motions, Mr. Clark focused primarily on the court's admission of the plaintiff's guilty plea in 2000 to aggravated incest. The court suggested that the door in this case seemed to have been opened to the criminal record because one of the plaintiff's witnesses had specifically testified that Mr. Clark had never had any problems with the law and was a clean-cut individual. After discussing the assertion by Mr. Clark that Dr. Butler had never conducted an examination of him, the court articulated that the felony and guilty plea were highly relevant on the issue of overall credibility of Mr. Clark, indicating more weight on the probative side of the equation.

We find that the admission of the guilty plea to the felony in 2000 was proper under La.Code Evid. art. 609 because it occurred less than ten years prior to trial, and it carried a sentence of over six months. Moreover, the trial court reviewed the criminal record in chambers and allowed no discussion in front of the jury,

23

allowing only a single question in their presence regarding the name and date of the crime as required by Article 609. In weighing the probative value and prejudicial effect of the admission, the trial judge's assessment of the probative value of evidence carries great weight, such that in the absence of a clear abuse of discretion, the ruling of the trial judge will not be reversed on appeal. *Billings v. State ex rel. Dept. of Transp. and Development*, 01-0131 (La.App. 3 Cir. 6/13/01), 826 So.2d 1133. We find no legal error under the technical provisions of Article 609, and we find no abuse of discretion in the trial court's evaluation of the prejudicial effect and the probative value of the felony evidence on the issue of credibility.

Regarding the claims of malpractice, the trial court found that there was sufficient evidence that the jury could have returned a verdict favorable to the plaintiff, but there was also substantial evidence to the contrary. The trial judge referred to the conflicting expert testimony in the case and the plaintiff's argument that no competent physician would have proceeded with the surgical procedure that Dr. Butler performed because there was no arthritis in the ankle. The trial court pointed out that it was not established at trial that there was no arthritis in the ankle, and there were physicians who agreed that Dr. Butler could have reasonably proceeded in the way that he did. In conclusion, the trial judge stated that there was "sufficient evidence that the jury could, as they did, conclude that there was no malpractice." We agree.

IV.

**CONCLUSION**

Based upon the foregoing, we affirm the judgment of the trial court pursuant to a jury verdict and affirm the trial court's denial of the plaintiff's motion

24

for a JNOV and for a new trial.  All costs of the appeal are to be borne by the plaintiff, Rickey Clark, Sr.

**AFFIRMED.**